PERCIVAL CONSTRUCTION CO., Plaintiff-Appellant and Cross-Appellee,

v.

MILLER & MILLER AUCTIONEERS, INC., Defendant-Counterclaimant and Appellee,

v.

P & A CONSTRUCTION COMPANY, INC., et al., Counterdefendants and Appellees,

v.

UNITED STATES of America, Counterdefendant-Appellee and Cross-Appellant.

Nos. 75–1111, 75–1112.

United States Court of Appeals, Tenth Circuit.

Argued Nov. 11, 1975.

Decided March 26, 1976.

---

Charles W. Stubbs, of Stubbs, Stiner & Pace, Oklahoma City, Okl. (William S. Ruggiero, with him on the brief), for plaintiff-appellant, and cross-appellee, Percival Const. Co.

Joseph M. McManus, Atty., Tax Div., Dept. of Justice, Washington, D.C. (Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews and Gary R. Allen, Attys., Tax Div., Dept. of Justice, Washington, D.C. and William R. Burkett, U. S. Atty., Oklahoma City, Okl., of counsel, with him on the brief), for counterdefendant-appellee, and cross-appellant, United States.

Charles W. Mooney, Jr., Oklahoma City, Okl. (Clyde A. Muchmore, and Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, Okl., with him on the brief), for counterdefendant and appellee, Stock Yards Bank.

Rufus S. Garrett, Jr., of Garrett, Settle & Callaway, Fort Worth, Tex. (Shirk, Withington, Work & Robinson, Oklahoma City, Okl., with him on the brief), for defendant-counterclaimant and appellee, Miller & Miller Auctioneers, Inc.

Before LEWIS, Chief Judge, and SETH and McWILLIAMS, Circuit Judges.

SETH, Circuit Judge.

This action concerns the right to proceeds from an auction sale of contractor's equipment. A claimant brought suit for the proceeds against the auction company which in turn brought in other claimants including a lien claimant, the United States.

The issues center on the application of the Oklahoma Uniform Commercial Code to the transaction whereby P & A Construction Company initially acquired possession and use of the equipment auctioned from Percival Construction Co. The trial court granted summary judgment and directed a verdict.

P & A Construction Company entered into an agreement with Percival Construction Co. on October 12, 1970. The agreement, entitled "lease," provided for monthly payments by P & A for the use of certain items of heavy equipment and included an option to purchase provision which set the purchase price and allowed for ninety-three per cent of all monthly payments to be applied to that price.

Thereafter, P & A granted Stock Yards Bank ("Bank") security interests in listed equipment and all of its accounts receivable, including after-acquired accounts. These interests were perfected pursuant to state law by the filing of financing statements. Included by mistake in the list of equipment presented as collateral for the Bank's security agreements were two backhoes which were also listed on the P & A–Percival "lease." At the time the Bank took the security interest it had no knowledge of the "lease" listing.

In the fall of 1972, P & A began having financial problems which led to the negotiation and signing of a supplemental agreement with Percival. The parties acknowledged P & A's original obligation of $75,000, and its reduction to a balance of $32,200 by monthly payments. The agreement recited that P & A's obligation had been timely reduced, that Percival was to forego all accruing "lease" payments, and that Percival consented to the sale of the "leased" equipment by an auctioneer to be retained by P & A. It also provided that if the equipment realized $30,000, P & A would be discharged of all liability under the "lease." Only upon the nonoccurrence of the sale would the equipment be returned to Percival in satisfaction of the P & A obligation.

P & A and Percival entered into an agreement in 1972 with Miller & Miller Auctioneers, Inc. to auction the equipment involved. Shortly thereafter, P & A delivered the equipment to Miller who was to make it ready for sale. The equipment remained in Miller's custody until the sale. Percival provided documents of title for the motor vehicles.

On October 30, 1972, the United States filed a tax lien for unpaid taxes against P & A, and an additional lien on December 26, 1972. Notices of levy were served on Miller on the date of the sale and subsequent thereto.

Percival alleges that sometime prior to the sale, it entered into an oral contract with Miller under which Percival was to receive the sum of $30,000 from the proceeds of the sale direct from Miller.

The auction sale took place as scheduled on December 5, 1972. The equipment covered by the "lease" realized approximately $37,000. Other equipment not here concerned was also sold. The Bank participated in arrangements for the sale of this equipment. The two backhoes listed in both the "lease" and in one of the Bank's security agreements constituted $8,600 of the $37,000 figure. The gross proceeds of the sale amounted to approximately $81,750.

Immediately after the sale, the United States, Percival, P & A, and the Bank all made demand on Miller for the portions of the proceeds they each claimed. Realizing the proceeds would not cover all claims, Miller made no disbursements. Percival initiated this suit against Miller, alleging itself to be true owner of the auctioned equipment. Miller deposited into the court registry the gross proceeds of the sale minus makeready expenses and commissions, and interpleaded the other parties claiming rights to the proceeds.

The trial court applied the Oklahoma Uniform Commercial Code to the "lease" and found it to be a conditional sale with ownership in P & A with the retention of a security interest by Percival. Since this security interest had never been perfected,

the court recognized the Bank's priority and granted the Bank partial summary judgment as against Percival. Finding no questions of fact for the jury, the court granted motions for directed verdicts in favor of Miller, the Bank, and the United States. The alleged oral agreement between Percival and Miller was ruled unenforceable as it was based on a mutual mistake of fact and law. The proceeds from the two backhoes with multiple listings were awarded to the Bank as the duplicate listings were the unilateral mistake of P & A, and the Bank had no knowledge of such at the time the backhoes were pledged as collateral. The United States was granted priority as to its first lien only, and the Bank was awarded the remainder of the proceeds as an account receivable of P & A in which the Bank held a prior perfected security interest.

Percival and the United States appealed from the court's rulings against their contentions.

Percival first challenges the jurisdiction of the court to hear this as an action in interpleader. Miller deducted its maker-eady expenses and commissions from the gross proceeds of the sale before depositing those proceeds into the court registry. Since Percival maintains there was no agreement to pay expenses to make ready the property to be auctioned nor to pay commissions after the sale, the deduction of those costs before deposit is in dispute and, Percival argues, Miller has not met the statutory prerequisite of deposit of the entire sum in controversy.

In the ordinary situation, the statutory interpleader under 28 U.S.C. § 1335 requires deposit of the entire sum in stakeholder's possession. In fact, the stakeholder here had run into that very difficulty in an earlier case before this Circuit. *See Miller & Miller Auctioneers, Inc. v. G. W. Murphy Industries,* 472 F.2d 893 (10th Cir.). However, in this particular proceeding Miller as a stakeholder has brought this action under Rule 22 of the Federal Rules of Civil Procedure. If the court already had jurisdiction by the diversity of citizenship presented by the parties here, Rule 22 provides Miller a

means by which it can join parties to protect itself from multiple liability.

 This action was originally filed in federal court as a diversity case. No party has disputed that allegation, nor would the facts permit such an argument. Instead, Percival chooses to argue that jurisdiction after Miller's interpleader depends as well on the deposit of the entire sum in controversy, as is necessary to establish jurisdiction under the Federal Interpleader Act. Miller, however, stated clearly in its counterclaim for interpleader that the action was being brought pursuant to Rule 22. Case law under the rule supports Miller's contention that the entire sum requirement is not present when interpleading under the Rule. It is deemed a matter within the court's discretion whether the stakeholder is required to bring the fund into the court at all. *Emmco Ins. Co. v. Frankford Trust Co.,* 352 F.Supp. 130 (E.D.Pa.); *United States v. Coumantaros,* 146 F.Supp. 51 (S.D.N.Y.). The court had already assumed jurisdiction on the basis of diversity of citizenship. Miller did not need the jurisdictional basis supplied by statutory interpleader.

Fundamental to the establishment of all parties' interests and priorities in this lawsuit is the proper determination of the rights created under the original agreement between P & A and Percival relative to the equipment. Although denominated a "lease," the lower court correctly found the terms of that agreement to be such that title actually passed to the "lessee" and a security interest was created in the "lessor."

 Percival attacks this decision by framing this issue in terms which would create a jury question, an issue of fact. The transaction is within the Oklahoma Commercial Code, and the applicable section, which sets out guidelines as to when a lease is intended as a security interest, emphasizes that the facts of each case are to be determinative. 12A Okl.St.Ann. § 1–201(37). The intent of the parties is one of those determinative facts, and Percival maintains that such intent can only be ascertained by a jury. However, here we are presented with an unambiguous contract, and the parol evidence rule requires the intention of the contracting parties to be determined from the contract itself. 1 Williston, Contracts, (3d Ed.) § 95. If resort was to be made to extrinsic evidence, it would indeed be the duty of the jury to weigh that evidence and determine the intent of the parties. But since here intent must be determined from within the four corners of the writing, the issue becomes a question of law for the judge. *In re Royer's Bakery,* 1 UCC Rep.Serv. 342; *see also In re Wheatland Electric Products Co.,* 237 F.Supp. 820 (W.D.Pa.). Thus the nature of the P & A–Percival contract, at least as to the intent of the parties, was not a jury question.

 The Code's definition as to when a lease is intended as a security goes on to provide that although the inclusion of an option to purchase does not of itself make the lease one intended for security, when the agreement provides that for no additional consideration, or for nominal consideration, the lessee may become the owner of the property, such provision does make the agreement one intended for security. 12A Okl.St.Ann. § 1–201(37). In applying this measure to the fact pattern here, the lower court adopted the test set out in *Crest Investment Trust, Inc. v. Atlantic Mobile Corp.,* 252 Md. 286, 250 A.2d 246. The critical elements of that test involve the consideration necessary for lessee to exercise the option to purchase and the percentage that consideration bears to the list price of the items leased. Under the cited case, if that percentage is less than twenty-five per cent, it is considered as showing the intent of the parties to make the lease a security. Here, the purchase option price is $8,040, which is approximately 10.6 per cent of the list price and well under the twenty-five per cent guideline. Further, that price was computed by allowing for ninety-three per cent of the rentals paid by P & A under the terms of the "lease."

This fact pattern, then, is similar to that analyzed in *In re Royer's Bakery, Inc.,* 1 UCC Rep.Serv. 342 (U.S.D.C.Pa.). In that

case, the percentage of the purchase option price to the list price was 9.5 per cent, with only eighty per cent of the rental payments being applied. The court in that case found the requisite intention to make the lease a security, and the case is cited in the most extensive analysis of this question as a good example of a lease intended as security. *See* "What Constitutes a Security Interest," 11 A.L.R.3d 1239. The facts of the case now in dispute are so similar to those in *Royer's Bakery* that that case becomes persuasive as to those elements of the *Crest* test.

■ A final element of the test is one related to the one last described. Thus where the terms of the lease and option to purchase are such that the only sensible course of action for the lessee at the end of the term is to exercise that option and become owner of the goods, then the lease becomes one intended to create a security interest. Here the absence of an option to terminate, which was present in the *Royer's Bakery* lease, compels the lessee to exercise his option to purchase as the only reasonable course of action available to him as a businessman.

■ In short, this case presents the classic example of a lease intended as a security interest. The lower court's ruling as to that status should be affirmed.

Percival also protests the lower court's granting of motions by Miller and the Bank for directed verdicts in their favor after plaintiff's proof. The argument advanced by Percival is again that the case included at least three issues of controverted facts which should have been tried to a jury.

The first issue concerns an alleged informal subordination of the Bank's interest in the proceeds from the sale of the leased equipment to Percival. Percival's contention that informal subordination can occur through a course of dealing, relying on *Williams v. First Nat'l Bank & Trust Co. of Vinita*, 482 P.2d 595 (Okl.), is not challenged. All parties did notify Miller of the rights each claimed to the leased equipment, although it is unclear just how know-

ledgeable each was about the other parties' claims.

■ Even if it could be assumed there was an informal agreement to subordinate, that agreement clearly was premised on the parties' mistaken belief that Percival owned the leased equipment. Technically, then, there was no subordination even at this point, but rather a recognition of what all parties thought to be a superior title. The "lease" between Percival and P & A has now been properly recognized as a conditional sale which passed title to P & A and created only a security interest in Percival. Oklahoma law is clear that when the minds of contracting parties fail to meet because of a mutual mistake which goes to the essence of the agreement, there is no consent and the contract is unenforceable. 15 Okl.St.Ann. §§ 53, 62–64; *Watkins v. Grady County Soil & Water Conservation District*, 438 P.2d 491 (Okl.). The earlier confusion as to ownership created a mutual mistake in the minds of the contracting parties. No consent ever existed and any subordination agreement would be unenforceable. In such a situation, it is within the trial court's discretion whether to grant a directed verdict. *Weeks v. Latter-Day Saints Hospital*, 418 F.2d 1035 (10th Cir.). The test to determine whether this discretion was abused requires the appellate court to view the evidence in the light most favorable to the party against whom the motion is made. *Gulf Ins. Co. v. Kolob Corp.*, 404 F.2d 115 (10th Cir.); *Weeks, supra*.

The court granted a second directed verdict in the Bank's favor regarding the inclusion of the two backhoes covered by the P & A–Percival "lease" on one of the Bank's security agreements with P & A. We find no error in this ruling.

■ It is clear from the facts that these backhoes were included as collateral in that agreement because of an error made by P & A in copying serial numbers, and that the Bank had no knowledge of that mistake. Thus the mistake was unilateral rather than mutual. Under Oklahoma law, where one party to a contract makes a mistake, but that mistake is not known to

the other party, the contract is not invalidated. *Siegle v. Hamilton-Carhartt Cotton Mills,* 89 Okl. 68, 213 P. 305; 3 Corbin, Contracts, §§ 599, 608. The court found that the backhoes belonged to P & A.

■ The third directed verdict challenged by Percival was that granted in favor of Miller on the issue of an agreement between Percival and Miller regarding the disbursement of the sale proceeds. The mutual mistake as to ownership of the leased equipment which invalidated the purported subordination agreement between the Bank and Percival again invalidates any agreement between Miller and Percival as to the proceeds from the sale of those goods.

■ Again, the mutual mistake serves to remove the element of mutual consent from whatever agreement, if any, was entered into. *Smalley v. Bond,* 92 Okl. 178, 218 P. 513. The lower court acted correctly and within its discretion when it granted Miller's motion for directed verdict as to this point; no fact issue remained as to it.

■ Percival's final point on appeal is the failure of the lower court to consider what it terms the effect of P & A's "default" under the "lease." A close reading of the "lease" and supplemental agreement does not support an interpretation of default. P & A had made all monthly payments on time until the one due on October 12, 1972. The letter containing the supplemental agreement is dated October 16, 1972, clearly within the ten-day grace period set out in the lease. The supplemental agreement states the obligation to have been timely reduced. Its terms include Percival's agreement to ". . . forego any and all lease payments on the subject contract which may be due now or in the future." Under the agreement, Percival did not find P & A in default nor did it reassume repossession of the equipment. Under these facts, no default can be said to have occurred.

Under the supplemental agreement, P & A retained its ownership interests in the equipment. Percival maintained its security interest. The parties merely reaffirmed the obligations and rights created under the "lease." The lower court correctly interpreted that agreement as having no effect on the parties' priorities.

■ The United States on appeal urges the priority of its lien filed second in time. The Government concedes the Bank had a prior perfected interest in the property specifically identified as collateral in its security agreements with P & A, since financing statements were filed in accordance with state law and prior to the filing of notice of either of the tax liens involved here. The Government does challenge the recognition by the trial court of a perfected security interest by the Bank as "accounts receivable" in the proceeds from the sale of P & A equipment *not listed* as collateral on the security agreements between the Bank and P & A. The Bank claims a secured interest in those proceeds on the theory that in the hands of the auctioneer, such proceeds constitute an account receivable within the scope of its security agreements with P & A. The Bank does concede that this alleged interest is junior to the first tax lien, which was filed prior to the sale of the equipment. It is the status of the second lien which is at issue here. The Code provides its own definition of "account," which includes ". . . any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper." 12A Okl.St.Ann. § 9–106. Case law under this section strictly limits the use of the term to a particular meaning. *In re Certified Packaging Inc.,* 8 UCC Rep.Serv. 95 (Utah); *In re Levine,* 6 UCC Rep.Serv. 238 (Conn.). *See also* Anderson, Uniform Commercial Code, § 9–106:4. The Bank argues P & A has a right to payment for goods sold by Miller as auctioneer. Agency law, however, suggests that payment has already been made to the seller through its agent, the auctioneer, when the buyer paid Miller immediately after the sale. The terms of the auction agreement indicate a principal-agent relationship between P & A and Miller. Under state law, such a relationship has been found in auction agree-

ments before. *Tulsa Auto Dealers Auction v. North Side State Bank,* 431 P.2d 408 (Okl.). In applying this agency theory to our case, since payment had been made to its agent, P & A had no further right to payment for goods sold as against the buyer. A right to have the funds remitted still remains, but that is a right arising from the auction-agency contract, and as such cannot be classified as an account receivable. *See Levine, Anderson.*

The proceeds arising from the sale of P & A equipment not specifically identified as collateral on P & A's security agreements with the Bank cannot be classified as accounts receivable. Since no security interest covered these proceeds, the Bank's claim to them is that of a general, unsecured creditor with no priority over the government tax liens. As such, the court was wrong in directing a verdict in favor of the Bank and that decision must be reversed.

The Government would also challenge, having been granted priority over the Bank as to the second lien, payment of Miller's attorneys' fees out of that portion of the interpleaded fund which is now impressed with a federal tax lien.

■■■ In its brief, the Government argues it is a well settled proposition that a federal tax lien is paramount to any right an interpleader may have as to attorneys' fees, citing *United States v. Chapman,* 281 F.2d 862 (10th Cir.), and cases cited therein. However, in *Chapman,* the right to attorneys' fees was not predicated on a security interest taken prior to the filing of notice of a tax lien. In our case, a security interest in the property auctioned was taken by Miller in the auction agreement dated October 16, 1972, to secure Miller's costs, commissions, and other expenses. That interest was perfected prior to the auction and less than forty-five days after the filing of the tax lien by taking possession of the property pursuant to the auction agreement, which antedated the filing of the lien. Possession of the equipment and then the proceeds was retained until the proceeds were brought into the court. The lien, therefore, should be subordinate to Miller's interest under 26 U.S.C. § 6323(c)(1), which provides:

"(c) Protection for certain commercial transactions financing agreements, etc.—

"(1) In general.—To the extent provided in this subsection, even though notice of a lien imposed by section 6321 has been filed, such lien shall not be valid with respect to a security interest which came into existence after tax lien filing but which—

"(A) is in qualified property covered by the terms of a written agreement entered into before tax lien filing and constituting—

"(i) a commercial transactions financing agreement,

"(ii) a real property construction or improvement financing agreement, or

"(iii) an obligatory disbursement agreement, and

"(B) is protected under local law against a judgment lien arising, as of the time of tax lien filing, out of an unsecured obligation."

It is clear that the priority granted Miller in the proceeds to secure its claims for commissions and expenses under that section includes Miller's attorneys' fees under the terms of clause (e)(3) of that same section, which allows that priority to be extended to cover ". . . reasonable expenses, including reasonable compensation for attorneys, actually incurred in collecting or enforcing the obligation secured . . . .."

Miller's award for attorneys' fees should be deducted from the interpleaded fund prior to the deduction of the sum owing to the Government due to the attachment of the second tax lien.

The case is affirmed in part and reversed in part as herein described. It is remanded to the trial court for further proceedings in conformance herewith.