In re Jack B. COOPER, d/b/a Mayday Productions, Inc., and d/b/a Tires Coast-To-Coast, Debtor.

Jack B. COOPER, Debtor, Plaintiff,

v.

FIRST INTERNATIONAL BANK IN HOUSTON, N. A., Defendant.

Bankruptcy No. 76–HB–671.

United States Bankruptcy Court, S. D. Texas, Houston Division.

Jan. 11, 1980.

D. J. Baker, Frank T. Garcia, Fulbright & Jaworski, Houston, Tex., for First Intern. Bank in Houston, N. A.

William C. Davidson, Jr., Campbell & Davidson, Austin, Tex., for Creditors Committee.

### MEMORANDUM OPINION ON COMPLAINT TO COMPEL TURNOVER

JOHN R. BLINN, Bankruptcy Judge.

The Creditors Committee in this case has filed a complaint for the turnover of funds against First International Bank in Houston, N.A. ("First International") which presently holds the funds as stakeholder but claims a perfected security interest in them.

On September 24, 1976, the date of filing his Chapter XI petition, Jack B. Cooper had on deposit in the Capital National Bank in Austin, Texas, $36,378.95. Capital National filed a state court interpleader action on September 20, 1976, to determine the validity and priority of claims to the funds. Pursuant to an agreed judgment entered into among all the parties, after the Chapter XI filing, these funds were transferred to First International to be held subject to further order of this Court.

First International claims the funds under a security agreement dated June 28, 1976 received by Houston-Citizens Bank & Trust Company (now First International by change of name). A security agreement was executed to secure a note of that same date in the amount of $200,000 and was perfected by filing on July 2, 1976. A second security agreement and note were executed on August 26, 1976, the date the first note matured. The second note (in an amount of $150,000) was cross-collateralized by all the security interests described in the first security agreement. The Creditors Committee, on the other hand, argues that the funds are not covered by the security agreement and therefore should be applied to the satisfaction of the claims of the general creditors.

The August 26, 1976 loan to Mr. Cooper, doing business as Mayday Productions, was to finance a public concert known as "Sunday Break II," to be held September 5, 1976. A security interest was granted by a form security agreement evidently directed primarily at accounts receivable, although in addition to printed provisions it contained the following specific description of additional collateral:

"All accounts receivable whether now existing or hereafter arising and resulting from the sale of tickets to a concert to be held on or about September 5, 1976 (such concert to be commonly known as SUNDAY BREAK II) and produced or pro-

moted by JACK B. COOPER d/b/a MAYDAY PRODUCTIONS and/or MAYDAY PRODUCTIONS: and any and all funds held by any ticket sales agent for the account(s) of Jack B. Cooper, Jack B. Cooper d/b/a Mayday Productions and/or Mayday Productions and arising as a result of the sale by such ticket sales agent of tickets to a concert on or about September 5, 1976 (such concert to be commonly known as SUNDAY BREAK II).

Mr. Cooper maintained a bank account at Capital National Bank in the name of "Mayday Productions." The bank records indicate an opening balance for the month of September, 1976, of $59.35. On September 3, 1976, there was a deposit of $28,000, which represented the proceeds of the second loan from First International. On September 7, 1976, another deposit was made in the amount of $36,056, representing $34,356 from ticket sales at the site of the concert and a $1,700 check from Chester Elizondo. Mr. Elizondo's check was subsequently dishonored and checks totaling $26,036.40 were drawn on the account, resulting in a final balance as of September 24, 1976 of $36,378.95. This amount was paid over into the registry of the Court by Capital National pursuant to the filing of their interpleader action. After payment of attorney's fees and costs in the interpleader, there remains a balance of $35,612.45, which is the subject of the present turnover complaint.

Tickets to the concert were sold thru two methods: Mayday Productions, Inc. utilized ticket distributors with outlets located throughout the state of Texas, each of which sold tickets and collected money for the sale of those tickets. Tickets were also sold on the concert site between September 2 and 5, 1976 by Mayday employees. Part of the receipts from the on-site ticket sales were used to pay the security guards; the remainder was deposited in the account at Capital National Bank on September 7, 1976.

At the time of trial, over the objection of the Creditor's Committee, First International developed testimony from Mr. Cooper regarding the intended scope of the security interest granted in the agreement of June 28, 1976. Also over the Creditors Committee's objection, First International offered into evidence a letter dated June 28, 1976, signed by Mr. Cooper and addressed to "Larry Lenig, Vice President of Houston-Citizens Bank & Trust," elaborating the scope of the security agreement. The Court did not rule on the objections, which the Creditors Committee has continued to urge in its post-trial brief.

The parties have framed three issues for the Court's consideration:

1. Whether extrinsic evidence offered to establish the intended scope of the security interest granted in the agreement of June 28, 1976, is admissible.

2. Whether the security interest granted First International under the agreement of June 28, 1976, extends to and covers receipts from ticket sales on the concert site.

3. Assuming the existence of a security interest in the on-site ticket sale receipts, whether such receipts after deposit in Capital National were so comingled with other funds as to render the security agreement unenforceable.

■ The term "account receivable" is not defined in the Texas Business and Commerce Code; however, Article 9 contains the following definition of an "account:"

any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance.

Tex.Bus. & Comm.Code § 9.106 (1968). Thus when goods are sold or leased or services rendered, and such sale, lease or rendition of services is not for cash but on an open account, an account receivable is created.

■ It is necessary to distinguish between the receipts from ticket sales made by Mayday employees on the site of the concert and receipts from sales of tickets by the ticket outlets. Unlike an agent, an

independent contractor is responsible to his employer only for the result of the work contracted to be performed. The employer has no control over the contractor's manner of doing the work nor any right to select the contractor's employees or supervise their work. *Porter v. Marotta*, 267 S.W.2d 222 (Tex.Civ.App.—San Antonio 1954, no writ). In the present case Mr. Cooper had contracted for the off-site sale of tickets by independent ticket distributors, but he had no direct control over the day-to-day operations of these people nor the manner and method by which tickets would be sold. The ticket distributors were accountable to Mr. Cooper only for the receipts from the sale of tickets. Thus we find the relationship between the ticket distributors and Mr. Cooper to be that of an independent contractor and employer, rather than that of principal and agent. As a result, payments by customers to these ticket distributors were not the same as direct payments to Mr. Cooper but instead created in Mr. Cooper a right to receive payment from these distributors, in essence "accounts receivable" which would be subject to the security interest granted First International.

Having disposed of that fairly straightforward situation, we come to the more difficult question of cash sales of tickets made on the actual site of the concert. The Creditors Committee contends that employees hired by Mr. Cooper to sell tickets on-site would be considered his agents and that a cash payment to an agent is equivalent to a cash payment to a principal. Thus, the Creditors Committee concludes, payments for tickets sold on-site are the same as direct cash payments to Mr. Cooper and cannot be accounts receivable.

As support for its argument the Creditors Committee cites the case of *Percival Construction Co. v. Miller & Miller Auctioneers, Inc.*, 532 F.2d 166 (10th Cir. 1976), 19 U.C.C. Rep.Ser. 244. In that case to secure a loan to the P & A Construction Company, the bank was granted a security interest in all present and future accounts receivable of P & A and certain items of equipment. P & A then sold some of the designated equipment to Percival by means of a lease-purchase agreement. When Percival encountered financial difficulties, Percival and P & A entered into an agreement with Miller & Miller Auctioneers whereby Miller would auction off all of the Percival equipment, including those items purchased from P & A. After the auction had taken place the bank argued its security interest extended to the proceeds of those items of equipment not listed as collateral on the original security agreement with P & A claiming because P & A Construction had a right to payment for goods sold by Miller & Miller as auctioneer, an account receivable was created, an account receivable covered under the security agreement in favor of the bank. 532 F.2d at 176.

The court denied the bank's argument, noting that under Oklahoma law the auction agreement between Miller & Miller and P & A created a principal-agent relationship between the two parties. Thus payment to the agent (the auctioneer) was the same as payment to the principal (P & A Construction) and after payment was made to P & A via its agent (Miller & Miller), P & A had no further right to payment for goods sold as against the buyer. A right to have the funds remitted still remained but that right arose from the agency relationship created by the auction contract rather than from a creditor relationship giving rise to an account receivable. 532 F.2d at 177.

We find the reasoning of the Creditors Committee as supported by the Tenth Circuit's decision in *Percival* to be persuasive. The term "agent" as defined in Texas law includes a person employed by a "principal" to perform service in his affairs whose physical conduct in the performance of the service is controlled by or is subject to the right to control by the principal. *Dry Goods Co. v. Kellog*, 145 S.W.2d 675 (Tex.Civ.App.—Waco 1940, writ ref'd). For a person to be regarded as a principal he must retain or exercise the power of control over his agent in directing not only the end sought to be accomplished but also the means and details of its accomplishment. *Truck Line v. Johnson*, 225 S.W.2d 888 (Tex.

Civ.App.—Galveston 1949, writ ref'd, n. r. e.); see 38 Tex.Jur.2d *Master and Servant* § 2 (1962).

■ Clearly such a principal-agent relationship existed between Mr. Cooper and those persons engaged to sell tickets on the site of Sunday Break II. Mr. Cooper had not only the power to order the sale of admission tickets but also to direct the time, place and manner in which such sales were to take place.

■ When an agent is expressly authorized to convey certain property of the principal, the agent also possesses as an incidental power the right to receive any money that may be immediately payable. See 2 Tex.Jur.2d *Agency* § 61, (1959). Acts done by an agent within the scope of his or her actual or apparent authority are binding on the principal. *Claer v. Oliver*, 62 S.W.2d 354 (Tex.Civ.App.—Beaumont 1933, no writ); *Nahm v. J. R. Fleming & Co.*, 116 S.W.2d 1174 (Tex.Civ.App.—Eastland 1938, no writ). As a result, authorized payments made to an agent within the scope of employment would be the same as payments made directly to the principal. Cash payments made to on-site agents of Mr. Cooper would be the same as cash payments made directly to Mr. Cooper himself and cannot generate accounts receivable. Therefore, the security interest of First International did not extend to include on-site cash sales of tickets.

First International cites *National Bank of Commerce of Birmingham v. Alabama Football, Inc.*, 20 U.C.C.Rep.Serv. 751 (N.D. Ala.1976), as authority for their contention that on-site ticket sales created accounts receivable. We find, however, several distinguishing features between *Birmingham* and the case at bar. The security interest granted to the bank in *Birmingham* attached to the right of Alabama Football, Inc. to receive payment from

> the Birmingham Park and Recreation Board, Sears, Roebuck & Company, . . . and any other person or entity for tickets sold by them to football games of the Birmingham Americans professional football team . . . all rights to receive

payment for and proceeds of sales of tickets to the games by debtor at any of its offices; *all rights to receive payment for and proceeds of sales of tickets to the games from any other source whatever; and the proceeds of each of the above.* (Emphasis added).

The security interest in *Birmingham* was broader than that normally encompassed by the term "accounts receivable" and as such is inapposite to the present case. In contrast to *Birmingham*, the security agreement executed by Mr. Cooper granted a security interest in only one category of collateral "all accounts receivable generated by the sale of tickets to the concert Sunday Break II." The agreement did not grant a general right to receive all payments for tickets sold but only those payments which generated accounts receivable owing to Mr. Cooper.

■ We next turn to the admissibility of extrinsic evidence. It has long been settled in Texas that extrinsic evidence will not be received into evidence if its effect is to vary, add to or contradict the terms of the written instrument. In the absence of fraud, accident or mistake, the intent of the parties to a written instrument that is clear and unambiguous on its face must ordinarily be ascertained from the instrument alone. *Ross & Sensibaugh v. McLelland*, 262 S.W.2d 205 (Tex.Civ.App.—Ft. Worth 1953, writ ref'd n. r. e.); *Robbins v. Houck*, 251 S.W.2d 429 (Tex.Civ.App.—Galveston 1952, writ ref'd, n. r. e.); 23 Tex.Jur.2d *Evidence* § 342 (1961).

■ It is equally well settled, however, that this rule of exclusion extends only to parties to the written instrument, those in privity with such a party or one who claims a right or benefit under the contract; the rule is inapplicable to situations where one of the litigants is a stranger to the agreement. *Pointer v. Pointer*, 197 S.W.2d 504 (Tex.Civ.App.—San Antonio 1946, no writ); *Williamson v. Diltz*, 101 S.W.2d 833 (Tex.Civ.App.—Eastland 1937, writ dism'd); *Johnson v. Portwood*, 89 Tex. 235, 34 S.W. 596 (1896); *Kingsbery v. Phil-*

lips Petroleum Co., 315 S.W.2d 561 (Tex.Civ. App.—Austin 1958, err. ref.). Thus, one not a party or privy to the instrument may ordinarily offer extrinsic evidence to demonstrate that the contract as written does not express the entire agreement of the parties. *Williford Lbr. Co. v. Malakoff Brick Co.*, 113 S.W.2d 248 (Tex.Civ.App.—Dallas 1938, writ dism'd); *Oil Well Supply Co. v. Burk-Waggoner Co.*, 261 S.W. 830 (Tex.Civ.App.—Amarillo 1924, no writ). Furthermore, one who is a stranger to a contract and thus not bound by the terms of the instrument is estopped from invoking the parol evidence rule to insist that others, including those party or privy to the original agreement, be bound thereby. *Vander Stucken v. Willoughby*, 242 S.W. 478 (Tex. Civ.App.—Austin 1922, no writ); *Pennington v. Bevering*, 9 S.W.2d 401 (Tex.Civ.App. —Ft. Worth 1928), *rev'd on other grounds* 17 S.W.2d 772 (1929); *Bagley v. Pollock*, 19 S.W.2d 193 (Tex.Civ.App.—Amarillo 1929, no writ); see, e. g., 23 Tex.Jur.2d *Evidence* § 344, pp. 506–507 (1961); see 4 Williston on Contracts § 647, pp. 1154–1167.

 In the present case First International, as successor-in-interest to Houston-Citizens Bank & Trust Company, is privy to the original contract but the Creditors Committee is not; nor does the Creditors Committee claim any right or benefit under the terms of it. Therefore, not only is the Creditors Committee, as a stranger to the contract, permitted to introduce extrinsic evidence to prove the actual intended scope of the original security agreement, but its adversary, First International, is at liberty to do so as well. Thus the letter from Jack B. Cooper addressed to "Larry Lenig, Vice President of Houston-Citizens Bank & Trust Company," is admissible. This letter reads in full:

> Pursuant to our agreement, and in consideration of a loan in the amount of $200,000 evidenced by a note dated June 28, 1976 payable to Houston Citizens Bank & Trust, I hereby covenant that the total gross receipts received by Mayday Productions as a result of tickets sold "at the door" to a concert to be held on or about September 5, 1976 will be delivered to you for credit to Mayday Productions account with Houston Citizens Bank & Trust.

It would be difficult to conceive of language which could express more clearly Mr. Cooper's belief that by the security agreement of June 28, 1976, he had granted the bank a security interest which encompassed the receipts from the on-site sale of tickets. Through the use of parol evidence we expand our original understanding of the term "account receivable" as used in connection with the security agreements and conclude that First International's security interest did in fact include all on-site ticket sale receipts.

 Having determined that the security interest of First International includes receipts from the on-site as well as off-site ticket sales there still remains the question of whether those receipts were so commingled with other funds as to defeat the claim of the bank. Both parties have addressed this problem in terms of tracing; that is, each side has attempted to reconstruct the flow of funds in and out of the deposit account established by Mr. Cooper at Capital National in order to determine which portion of the remaining balance actually represents the September 7th deposit of on-site ticket sale receipts. As diligent as the attorneys have been in their efforts, they have overlooked § 9.306(d) of the Texas Business & Commerce Code which specifically sets out rules governing a secured party's continuing right to trace proceeds in the event of insolvency proceedings by or against the debtor. Insolvency proceedings are defined to include "proceedings intended to liquidate or rehabilitate the estate of the person involved." Tex.Bus. & Comm. Code § 1.201(22) (1968). Therefore, § 9.306(d) is applicable even in the event a Chapter XI petition is filed and the debtor is seeking merely to reorganize his estate, not liquidate it.

 The term "proceeds" includes, among other things, "whatever is received upon the . . . collection . . . of collateral . . . ." When proceeds are

in the form of money, checks, deposit accounts and the like they are "cash proceeds." Tex.Bus. & Comm.Code § 9.306(a) (Supp.1978–79). Therefore, the cash and checks collected upon the sale of tickets on the site of Sunday Break II would be considered "proceeds" and, in particular, "cash proceeds."

 In the event a debtor institutes insolvency proceedings, the security interest of a creditor holding a perfected security interest in cash proceeds continues as to all undeposited, uncommingled and identifiable cash proceeds. Once, however, those cash proceeds are deposited in a general deposit account, § 9.306(d)(4)(B) sets out a formula to determine the secured creditor's interest in the commingled account. This formula is apparently in lieu of the right to trace and limits any right the secured creditor would have had in non-Code situations to trace proceeds by any means available. Section 9.306(d) reads as follows:

(d) In the event of insolvency proceedings instituted by or against a debtor, a security party with a perfected security interest in proceeds has a perfected security interest only in the following proceeds:

(1) in identifiable non-cash proceeds and in separate deposit accounts containing only proceeds;

(2) in identifiable cash proceeds in the form of money which is neither commingled with other money nor deposited in a deposit account prior to the insolvency proceedings;

(3) in identifiable cash proceeds in the form of checks and the like which are not deposited in a deposit account prior to the insolvency proceedings; and

(4) in all cash and deposit accounts of the debtor in which proceeds have been commingled with other funds, but the perfected security interest under this Subdivision (4) is

(A) subject to any right of set-off;

SU2H(B) limited to an amount not greater than the amount of any cash proceeds received by the debtor within ten days before the institution of the insolvency proceedings less the sum of (I) the payments to the secured party on account of cash proceeds received by the debtor during such period and (II) the cash proceeds received by the debtor during such period to which the secured party is entitled under Subdivisions (1) through (3) of this Subsection (d).

 Thus § 9.306(d)(4)(B) acts to limit the secured party's interest to an amount not greater than the amount of any cash proceeds received by the debtor within the last ten days before the bankruptcy or other insolvency proceeding was initiated. "The idea evidently is that the right to trace does not survive unless the debtor has been required to segregate the cash proceeds from his other cash assets." Gilmore, *Security Interest in Personal Property*, Vol. II, p. 1338.

 Mr. Cooper's September 7th deposit was into an account which already contained proceeds from the August 26 loan. The depositing of the on-site ticket sale "cash proceeds" into a general account creating a commingled bank account combined with the later filing of a bankruptcy proceeding triggers the tracing formula of § 9.306(d)(4)(B). First International, as the holder of a perfected security interest in cash proceeds, is entitled to any cash proceeds received by the debtor, Cooper, within the 10 days preceding the filing. The last deposit of "cash proceeds" by Mr. Cooper was made on September 7, 1976; he did not, however, file his Chapter XI proceeding until September 24, 1976, more than 10 days later. Therefore, although First International holds a perfected security interest in all the cash proceeds received from the on-site ticket sales, the operation of § 9.306(d)(4)(B) precludes First International from reaching any of the funds. The problem of tracing could have been avoided had the bank required Mr. Cooper to maintain a separate account for the proceeds of ticket sales or to turn over those funds immediately upon their receipt.

For all the reasons hereinabove stated, I find and conclude that the Creditors Committee in the matter of Jack B. Cooper is entitled to the turnover of $35,612.45 currently being held in an account at First International Bank. Counsel for the Creditors Committee shall present a proposed judgment within ten days of the date of this Opinion.