**UNITED STATES of America for the Use and Benefit of EDDIES SALES AND LEASING, INC., d/b/a Eddies White Truck Sales, Plaintiff–Appellee,**

v.

**FEDERAL INSURANCE COMPANY, Chubb Group of Insurance Companies, and Utility Contractors, Inc., Defendants–Appellants.**

No. 79–2199.

United States Court of Appeals, Tenth Circuit.

Submitted July 1, 1980.

Decided Dec. 1, 1980.

Jay C. Baker of Baker & Baker, Tulsa, Okl., and Patrick L. Dougherty, Wichita, Kan., for defendants–appellants.

Robert L. Varilek, Rapid City, S. D., W. Bland Williamson and Kevin M. Abel, of Pray, Walker, Jackman, Williamson & Marlar, Tulsa, Okl., for plaintiff–appellee.

Before McKAY, LOGAN and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

After examining the briefs and the appellate record, this three–judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. *See* Fed.R. App.P. 34(a); Tenth Cir. R. 10(e). The cause is therefore ordered submitted without oral argument.

In February 1978, Utility Contractors, Inc. contracted with the United States Corps of Engineers to construct channel improvements on Joe Creek in Tulsa, Oklahoma. As required by the terms of their contract and by the Miller Act, 40 U.S.C. § 270a, Utility provided a payment bond through Federal Insurance Company, the surety, to afford protection to persons supplying labor or materials to Utility or its subcontractors for use on the Joe Creek project.

Utility entered into a subcontract agreement with Mid–States Construction Company of Derby, Inc. under which Mid–States agreed to perform excavation work on the project. Mid–States had insufficient equipment to meet the demands of this undertaking and negotiated with Eddies Sales and Leasing, Inc. to procure additional trucks and trailers. Specifically to meet the needs of Mid–States, Eddies purchased sixteen used trucks and trailers with approximately $300,000 of its own funds and had them delivered to Mid–States at the Joe Creek project site. Eddies and Mid–States executed an agreement obligating the latter to pay the following amounts for the equipment: $20,000 on June 10, 1978; $30,000 on June 19, 1978; $15,000 on July 1, 1978; and $12,000 a month for twenty–four months thereafter, amounting to total payments of $353,000.

When Mid–States failed to pay an insurance premium covering the equipment, Eddies repossessed the trucks and trailers on June 23, 1978. By that time, Mid–States had defaulted on its two June payments to Eddies by tendering checks totaling $50,000 which were returned due to insufficient funds.

■ Eddies sold the repossessed equipment and brought suit on the payment bond against Mid–States, Utility, and Federal Insurance Company under the Miller Act to recover the contract amount that Mid–States had failed to pay. At trial, the primary dispute was whether the transaction between Eddies and Mid–States constituted a lease, which is covered by the Miller Act, or a sale, which is not. After a non–jury trial, the district court held the agreement to be a lease[1] and awarded Eddies $50,000 plus interest, representing the unpaid installments of June 10 and 19.

■ Utility and Federal Insurance Company[2] appeal the judgment in favor of Eddies, contending the district court erred in finding that the equipment was leased to Mid–States. It is their contention that the equipment was furnished pursuant to a capital acquisition contract and that the Miller Act is inapplicable. We agree and reverse the judgment.

■ The Miller Act requires a contractor to post a surety bond "for the protection of all persons supplying labor and material in

1. The trial court found the "lease" agreement to be ambiguous. Therefore, the admission of parole evidence to explain the terms of the agreement was proper. *See, e. g., Panhandle Cooperative Royalty Co. v. Cunningham,* 495 P.2d 108, 115 (Okl.1971); *Restatement of Contracts* §§ 231, 233 (1932).

2. Eddies' argument that Federal Insurance, as surety, may not appeal in the absence of an appeal by Mid–States, the principal, is without merit. *See Celanese Coatings Co. v. Gullard,* 504 F.2d 466, 469 (9th Cir. 1974).

the prosecution of the work provided for" in any government contract exceeding $25,000 in value. 40 U.S.C. § 270a(a)(2). A fair rental charge for the use of earth–moving equipment at a federal channel improvement project is within the purview of the Miller Act bond because the value of the lease payment is substantially consumed in the project. *See Tom Growney Equipment, Inc. v. Fisher,* 457 F.2d 1298 (10th Cir. 1972); *Roane v. United States Fidelity & Guaranty Co.,* 378 F.2d 40, 43 (10th Cir. 1967). On the other hand, a purchase of such equipment is not covered because the seller is not supplying materials to be consumed on the bonded project. *Continental Casualty Co. v. Clarence L. Boyd Co.,* 140 F.2d 115 (10th Cir. 1944).

█ In deciding whether the transaction in this case is a lease or a sale, an initial question arises as to what law governs the determination. "The Miller Act provides a federal cause of action, and the scope of the remedy as well as the substance of the rights created thereby are matters of federal not state law." *F. D. Rich Co. v. Industrial Lumber Co.,* 417 U.S. 116, 127, 94 S.Ct. 2157, 2164, 40 L.Ed.2d 703 (1974). There is a conflict in the circuits, however, whether federal or state law governs the construction of a subcontract to which the United States is not a party in a case arising under the Miller Act. *See Burgess Construction Co. v. M. Morrin & Son Co.,* 526 F.2d 108, 114 n. 2 (10th Cir. 1975). As in *Burgess Construction Co.,* we need not decide that issue because we find no conflict between the conclusion we reach here and the laws of Oklahoma, where the contract was performed.[3] *See id.*

The terms of the transaction are undisputed. The parties attempted to transform a printed "Retail Installment Contract–Security Agreement" form into a lease agreement by changing the form title to "Installment Lease–Security Agreement" and by typing the words "lease", "lessee", and "les-

sor" over some of the printed words "purchase", "purchaser", and "seller". Despite the interlineation of leasing terminology, the parties' agreement provides for rights and duties more commonly found in a contract of sale. For example, Eddie Rypkema, the president of Eddies, testified that the total amount due under the lease was calculated to achieve a net pay–out of the equipment over the term of the lease. Most significantly, there was an oral understanding that the equipment was to be owned by the "lessee" at the termination of the lease with no more than the nominal payment of $1.00. The Oklahoma Uniform Commercial Code addresses such an option:

> "*Whether a lease is intended as security is to be determined by the facts of each case; however,* (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) *an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.*"

12A Okl.Stat. § 1–201(37) (emphasis added). We applied this provision of Oklahoma law in *Percival Construction Co. v. Miller & Miller Auctioneers, Inc.,* 532 F.2d 166 (10th Cir. 1976), and concluded that the "lease" there was actually an installment sale. "[W]here the terms of the lease and option to purchase are such that the only sensible course of action for the lessee at the end of the term is to exercise that option and become owner of the goods, then the lease becomes one intended to create a security interest." *Id.* at 172. *See Meyer v. World Concrete, Inc.,* 431 P.2d 403 (Okl.1967). *See generally* Annot., *Equipment Leases as Security Interest Within Uniform Commercial Code § 1–201(37),* 76 A.L.R.3d 11 (1977).

Other factors generally considered to indicate that an agreement is in substance a

---

3. Oklahoma was the forum state of this action and the place where the contract was performed. Eddies does not argue for the application of the law of any other state.

secured installment sale clothed in lease terminology include

"such factors as whether the lessee is required to insure the goods in favor of the lessor for a value equal to the total rental payments; the risk of loss or damage is on the lessee; the lessee is to pay for taxes, repairs and maintenance; there are default provisions governing acceleration and resale; a substantial non–refundable deposit is required; the goods are to be selected from a third party by the lessee; ...."

J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 22–3, at 882 (2d ed. 1980). All of these factors are present here. Mid–States was required to insure the equipment in favor of Eddies, the risk of loss or damage was on Mid–States and it was required to pay for taxes, repairs and maintenance, and the agreement contained default provisions governing acceleration and resale. Each of these provisions was part of the Retail Installment Contract–Security Agreement form used by the parties and none of them was crossed out when the form was "converted" to a "lease" agreement. In addition, the agreement provided for prepayment of the obligations. Although a substantial, nonrefundable deposit was not required, Eddie Rypkema testified the high front end payments on the agreement were required in part because there was not the customary advance payment. The parties also testified that an officer and employee of Mid–States went to Kansas City to select suitable equipment to be purchased from a third party by Eddies.

The district court found that the parties "intended" a lease agreement rather than a purchase contract. It focused on the manner in which the agreement was styled and the fact that Rypkema was aware of a lessor's rights under the Miller Act. Neither of the considerations is determinative.

The manner in which the agreement was styled by Eddies and Mid–States does not determine its character. *See Percival Construction Co. v. Miller & Miller Auctioneers, Inc.*, 387 F.Supp. 882, 884 (W.D.Okl.1973), *affirmed*, 532 F.2d 166 (10th Cir. 1976). *See also Union Pacific Railway v. Chicago R.I. & P. Railway*, 163 U.S. 564, 582, 16 S.Ct. 1173, 1180, 41 L.Ed. 265 (1896); *Watson v. United States*, 222 F.2d 689 (10th Cir. 1955). Designation as a lease is assailable if such denomination contravenes the economic realities of the transaction. In recharacterizing a transaction in a tax case, the Supreme Court noted that the substance and not the form of an agreement must prevail. *Commissioner v. P. G. Lake, Inc.*, 356 U.S. 260, 266–67, 78 S.Ct. 691, 695–696, 2 L.Ed.2d 743 (1958). "Their essence is determined not by subtleties of draftsmanship but by their total effect." *Id.*

Despite the claimed intention of Eddies to effect a lease, the economic realities dictate that this transaction was a secured sale of the earth--moving equipment from Eddies to Mid–States. The district court made no finding that the rental payments of $50,000 for the period of time the equipment was used on the project (approximately 40 days) constituted fair rental for that period of time. *See Massachusetts Bonding & Insurance Co. v. Clarkedale Machinery Co.*, 88 F.2d 388 (5th Cir. 1937). In fact, the evidence shows that the fair rental value of similar unmanned equipment was no more than $13,050 per month, or approximately $17,400 for the 40–day period. Rypkema testified that the high payments at the front end of the lease were for the purpose "of supporting the lease and making it safe." Rec., vol. II, Pl. Ex. 11 at 29.

Rypkema also testified the option to purchase was given orally because if the option is written in the same document "then you can't treat it as a lease and cannot charge it off as a lease" for tax purposes. *Id.* at 34. When pushed by counsel for defendants to explain the difference between the subject transaction and an installment sale, Rypkema said:

"A The first is that the lease allows them to make a total charge–off of the amount paid. That is the big difference.

"Q All right. Sir, are there any other differences?

"A That is the big advantage of the lease.

"Q What you are really telling me is that you are taking a sale and trying to structure it in the form of a lease for tax purposes?

" . . . .

"A The difference–the other advantage is for dollar and other considerations that they acquire at the end of the contract for lease. The purchaser does not. That is another.

"Q Say that again. I don't believe I follow you.

"A On the lease, at the end, for the oral purpose is that for a dollar and other considerations they can acquire the equipment at the end of the fulfillment of the lease.

"Q So there is a dollar difference between the two?

"A Yes.

"Q Your answer is what?

"A There would be a dollar difference.

"Q That and the tax difference is the only–

"A Is the big difference."

*Id.* at 50–51. It is apparent the parties styled this transaction as a lease partly for tax purposes. It is also likely the Internal Revenue Service would look through the form of an agreement such as this and tax it as a sale. *See, e. g., Martin v. Commissioner*, 379 F.2d 282 (6th Cir. 1967); *Estate of Starr v. Commissioner*, 274 F.2d 294 (9th Cir. 1959); *Oesterreich v. Commissioner*, 226 F.2d 798 (9th Cir. 1955).

The fact that Rypkema "was aware of his rights under the Miller Act if the property was leased, as opposed to an installment purchase contract," rec., vol. I, at 55, sheds little light on the nature of the transaction. This knowledge is as consistent with an attempt to establish a lease by subterfuge as it is with the desire to create an actual lessor–lessee relationship. We are not impressed by the intent of the parties to obtain Miller Act coverage despite the substance of the transaction, anymore than the courts are impressed by efforts to obtain tax deductions for lease payments when the transaction is actually a sale. *See Mt. Mansfield Television, Inc. v. United States*, 239 F.Supp. 539 (D.Vt.1964), *aff'd*, 342 F.2d 994 (2d Cir.), *cert. denied*, 382 U.S. 818, 86 S.Ct. 43, 15 L.Ed.2d 65 (1965). We agree with counsel for defendants that if someone "put[s] a sign on a dog that says cat, that doesn't make that dog a cat. . . ." Rec., vol. II, Pl. Ex. 11 at 32.

Although the parties may have "intended" the agreement to constitute a lease for tax and Miller Act purposes, the undisputed economic realities of the transaction make it an installment sale not covered by the Miller Act. The judgment below is reversed, and the case is remanded to the district court for entry of judgment dismissing the action against Utility and Federal Insurance.