**In re Charles McNary BOLING, Karen Ernestine Boling, d/b/a Boling Greenhouses, d/b/a Ten Wheelers, Debtors.**

**Charles M. COODE, Trustee and Charles M. Boling, Plaintiffs,**

**v.**

**M & J FINANCIAL CORPORATION, Defendant.**

**Bankruptcy No. 3–80–01028.
Adv. No. 3–80–0602.**

United States Bankruptcy Court, D. Tennessee.

May 18, 1981.

**40**

John H. Fowler, Knoxville, Tenn., for plaintiff Charles M. Boling.

Richard Stair, Jr., Knoxville, Tenn., for plaintiff Charles M. Coode, Trustee.

Lindsay Y. McDonough, Knoxville, Tenn., and R. Franklin Norton, Knoxville, Tenn., for defendant.

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

This adversary proceeding involves the respective rights of the parties in four trailers. Each trailer is the subject of a lease from defendant, M & J Financial Corporation (M & J) to the debtor, Charles Boling (Boling). The trustee contends that the leases are ones intended for security and that M & J failed to perfect a security interest.[1] M & J contends (1) that on the date of bankruptcy M & J owned the trailers subject to executory contracts with Boling, and (2) that, even if Boling owned the trailers, M & J had perfected security interests therein.

The parties have stipulated the following issues:

1. Does the law of Tennessee and/or North Carolina govern the construction of the subject Lease Agreements, performance thereunder, and any required perfection of security interests?

2. Under applicable law are the Lease Agreements true leases or leases intended for security?

3. If the Lease Agreements are leases intended for security, what is the nature of the respective interests of the parties to this litigation?

### I

M & J, a North Carolina corporation, is engaged in the business of financing the purchase or lease of various items of personal property to individuals and corporations. Boling is a Tennessee resident operating *inter alia* a trucking business. After Boling filed a Chapter 11 petition in this court on August 5, 1980, 11 U.S.C. § 301, George Coode was appointed trustee. 11 U.S.C. § 1104(a).[2]

In 1980, Boling contacted M & J's representative in Shelby, North Carolina, to discuss the purchase or lease of commercial trailers. Specifically, Boling wanted to lease the trailers, pay rent for the period of the lease, pay an additional sum at the end of the lease term, and receive title to the trailers. *See* Deposition of Charles M. Boling, January 13, 1981, p. 16. At the trial Boling testified that he wanted to buy the trailers through a "lease purchase" arrangement. *Id.* at 12.

In May of 1980 Boling leased three 1979 Great Dane trailers from M & J.[3] The leases are identical. Each lease provides for the payment of $680.87 per month for a period of 42 months. In addition, each required the payment of a nonrefundable security deposit of $2400.00. The original cost of each unit is estimated at $24,000.00. The leases provide that Boling has the option to purchase the trailers at the end of

---

1. The trustee relies on the "strong arm clause" of 11 U.S.C. § 544(a), Trustee as a lien creditor and as successor to certain creditors and purchasers. Boling, the debtor, relies on 11 U.S.C. § 1107, Rights, powers and duties of debtor in possession, together with § 544(a).

2. After this adversary proceeding was instituted Coode resigned as trustee and Boling was restored to possession and management of the property of the estate and operation of the business. 11 U.S.C. § 1105.

3. These leases were executed on May 19, May 22, and May 28, 1980.

the lease term for the "estimated Fair Market Value at end of Lease." Each lease states that the "Estimated Fair Market Value at end of Lease ..." is $2400.00.

On June 3, 1980, Boling executed a lease for a 1974 Timpte Trailer. Monthly payments of $481.00 were to be made for 36 months in addition to a $1400.00 nonrefundable security deposit. The lease contains a purchase option identical to the provisions in the three leases discussed above:

> "20. PURCHASE OPTION. Lessee shall have the option, if exercised within thirty (30) days of the end of the Lease Term, to purchase the Vehicle for the estimated Fair Market Value at end of Lease as determined by Lessor."

In the Timpte lease, the operative term, "estimated Fair Market Value ..." is described as follows:

> "Estimated Fair Market Value at end of Lease as determined by Lessor $_____."

Each lease provides that "The Vehicle is, and shall at all times remain, the property of Lessor...." Additional provisions require Boling to bear the risk of loss and to provide and maintain insurance on the vehicles. The leases further provide that they "... shall be governed by and construed in accordance with the laws of the State of North Carolina...." ¶ 26.

The leases were executed at M & J's place of business at Shelby, North Carolina. Boling took possession of the trailers and brought them to his place of business at Greenback, Tennessee. M & J obtained North Carolina certificates of title for the vehicles. Col. Ex. 2. These certificates show M & J Financial Corporation as the owner of the vehicles. No liens are noted on the certificates. M & J executed a Tennessee "Application for Certificate of Title and Registration" for each vehicle and forwarded the applications together with the North Carolina certificates of title to Boling. Boling, however, did not apply for certificates of title in Tennessee. Thus, the only certificates of title outstanding are the North Carolina certificates showing M & J as the owner.

## II

As set forth heretofore, there were contacts with both Tennessee and North Carolina. Also, as set forth heretofore, the lease agreements provide that the instruments shall be "governed by and construed in accordance with the laws of the State of North Carolina." The initial question is which state's law applies. Tennessee is, of course, the forum state.

T.C.A. § 47–1–105(1) states that, except as provided in that section, when a transaction bears a reasonable relation to more than one state, the parties may agree that the law of either state shall govern their rights and duties. Section 105(2), however, states

> "Where one of the following provisions of chapters 1 through 9 of this title specifies the applicable law, that provision governs and a contrary agreement is effective only to the extent permitted by the law (including the conflict of laws rules) so specified:
>
> .    .    .    .    .
>
> "Policy and scope of the chapter on Secured Transactions. §§ 47–9–102 and 47–9–103."

■ Thus, when the choice of law is specified by a section of the Uniform Commercial Code, to the extent that that section governs, a contrary agreement of the parties is ineffectual. *Doyle v. Northrop Corp.*, 25 U.C.C.Rep. 982 (D.C.D.N.J.1978). However, since Article 9 of the Code deals only with security interests, the parties' choice of law will govern *other* aspects of the agreement. *Id.* at 942.

Subject to the exceptions in § 47–9–103 and § 47–9–104, Tennessee law applies to "any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods...." T.C.A. § 47–9–102(1)(a). The exceptions contained in § 47–9–103(2)

pertain to collateral consisting of certain types of intangibles or mobile equipment.[4]

According to the Tennessee Court of Appeals, speaking through Judge Drowota (now Justice Drowota), the "situs" rule of T.C.A. § 47–9–102 applies to the events that occur while the collateral is *located* within Tennessee. *Mammoth Cave Production Credit Association v. Oldham*, 569 S.W.2d 833 (Tenn.Ct.App.M.S.1977). *Oldham* involved tobacco grown in Kentucky and sold in a warehouse in Tennessee. The plaintiff asserted a security interest in the tobacco and alleged that the sale of the tobacco amounted to a conversion. In order to maintain a conversion action, the existence of a valid security agreement was required. Because the transaction which was intended to create the security interest took place in Kentucky, the law of Kentucky was applied to determine the validity of the security interest.

■ In the present controversy the transactions were entered into in North Carolina. The parties agreed that the law of North Carolina would apply. The law of that State, therefore, will determine the *nature* of the transaction.

### III

A security interest is an interest in personal property which secures the payment or performance of an obligation. N.C.Gen. Stat. § 25–1–201(37). Under certain circumstances a lease of personal property or fixtures may be construed as a lease intended for security as distinguished from a "true" lease. If the transaction constitutes a lease intended for security, the requirements of Article 9 of the UCC must be complied with. If, however, the transaction is a true lease, Article 9 is inapposite.

■ Generally, the intention of the parties to the transaction will determine the character of the transaction. Thus, each case can only be determined on the basis of its own facts. *See* Anderson, Uniform Commercial Code § 1–201:111 (2d ed. 1970). Section 25–1–201(37) refers specifically to the effect of an option to purchase:

"(a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security."

The courts of North Carolina have on more than one occasion examined transactions to determine whether they are "true leases" or "leases intended for security." In *NYTCO Leasing, Inc. v. Dan-Cleve Corporation*, 31 N.C.App. 634, 230 S.E.2d 559 (1976), the North Carolina Court of Appeals considered it important that the lessor was not in the business of manufacturing or selling the property in question. Instead, the lessor purchased the property on the open market for the lessee pursuant to specifications provided by the lessee. Similarly in the present case M & J is not in the business of manufacturing or selling trailers and motor vehicles. M & J's vice president testified that 55–60% of M & J's business involves motor vehicle leasing. At the time of trial M & J had leases outstanding of some $8,000,000.00 covering between 500 and 600 units.

Again in 1977, the North Carolina Court of Appeals was confronted with the issue of whether a lease was intended as security. *Borg-Warner Acceptance Corporation v. David*, 32 N.C.App. 559, 232 S.E.2d 867 (1977). While the agreement in *David* did not contain an option to purchase or renew, several factors were considered by the

---

4. "If the *chief* place of business of a debtor is in this state, this chapter governs the *validity and perfection* of a security interest and the possibility and effect of proper filing with regard to general intangibles or with regard to goods of a type which are normally used in more than one (1) jurisdiction (such as automotive equipment, rolling stock, airplanes, road building equipment, commercial harvesting equipment, construction machinery and the like) if such goods are classified as equipment or classified as inventory by reason of their being leased by the debtor to others." T.C.A. § 47–9–103(2). (Emphasis added).

court. The agreement provided that no title or right passed to the lessee except as expressly granted; indeed, on termination of the lease the property was to be shipped to the lessor at the lessee's expense. Finally, the lessee agreed to maintain the property in good condition, the lessee bearing the expense. The present leases contain similar clauses.[5] The *David* leases were held to be "*true leases.*"

In *Szabo Food Service, Incorporated, of North Carolina v. Balentines, Inc.,* 285 N.C. 452, 206 S.E.2d 242 (N.C.S.Ct.1974), the North Carolina Supreme Court examined a somewhat unusual transaction and held it to be a lease. In that case a declaratory judgment action was brought to adjudicate the liability and responsibility of the parties for ad valorem taxes on certain restaurant equipment. Based upon the particular circumstances before it, the Supreme Court held that the contract between the parties which was denominated a lease was in reality a true lease and not a conditional sales agreement; further, that title and ownership of the equipment remained in the plaintiff. The court did not apply the North Carolina UCC because the rights and duties of a party to a security transaction under the UCC are defined without reference to the location of title,[6] which the court stated was "crucial" to the issue to be determined in that case. However, the court stated that the "same considerations which refute the contention that the contract was a conditional sale negate any intention to create a security interest...." *Id.* at 252 S.W.2d.

The court noted that one of the "principal" tests for determining whether a contract was a conditional sale or a lease is whether the purchaser is obligated to pay the purchase price. If the property is required to be returned, or if the property may be returned, the contract is a lease. In addition, the court held that § 25–1–201(37)(b) did not "fit the facts of this case." *Id.* at 252 S.W.2d.

Four tests have been used by courts in jurisdictions other than North Carolina to determine whether consideration is nominal within the meaning of § 1–201(37). The first test requires a comparison of the option price and the market value of the property at the time the option is exercised. The second is whether the option to purchase gives the lessee "no sensible alternative" but to exercise the option. The third involves a comparison of the option price and the original cost of the property. The fourth involves a comparison of the option price and the total rentals required under the lease. Annot., 76 A.L.R.3d 11, 19 (1977).

The test requiring a comparison of the option purchase price and the market value at the time of purchase has been stated to be the "best" test. *Peco, Inc. v. Hartbauer Tool & Die Co.,* 11 U.C.C.Rep. 383 (Ore.S.Ct. 1972). See *Davis Brothers v. Misco Leasing, Inc.,* 508 S.W.2d 908 (Tex.Ct.Civ.App. 1974). As stated by Judge Goldhaber in *In re Universal Medical Services, Inc.,* 8 U.C.C. Rep. 614, 617 (U.S.D.C.E.D.Pa.1970), the courts

"in referring to the term 'nominal' frequently use it interchangeably with the sum of one dollar or some other piddling amount ... but the real yardstick in determining whether the option price is

---

**5.** The leases in the present case provide as follows:

"6. OWNERSHIP OF VEHICLE. The Vehicle is, and shall at all times remain, the property of Lessor; and Lessee shall have no right, title or interest therein or thereto except as expressly set forth in this Lease.

.      .      .      .

"8. USE, REPAIRS, ALTERATIONS. Lessee shall use the Vehicle in a careful manner ... Lessee, at its expense, shall keep the Vehicle in good condition and repair. All additions, improvements, and replacements made to the vehicle shall belong to Lessor.

"9. SURRENDER. On or before the expiration or earlier termination of the Lease, Lessee, at its expense, shall return the Vehicle in good condition and repair, ordinary wear and tear resulting from proper use thereof alone excepted, by delivering it to such place as reasonably specified by Lessor."

**6.** "Each provision of this Article with regard to rights, obligations and remedies applies whether title to collateral is in the secured party or in the debtor." N.C.Gen.Stat. § 25–9–202.

nominal or substantial would appear to hinge on whether that price bears a resemblance to the fair market price of the article...."

*Universal* involved the lease of highly specialized automated biochemical equipment for a five year period. The lessee had an option to purchase each piece of equipment at the end of the lease term for 10% of the selling price of the equipment. The court constructed the following chart for comparative purposes:

| EXHIBIT | SELLING PRICE | TOTAL RENTAL | OPTION |
|---------|--------------|--------------|--------|
| A | $64,000.00 | $90,240.00 | $6,400.00 |
| B | 64,000.00 | 90,240.00 | 6,400.00 |
| C | 44,100.00 | 62,181.00 | 4,410.00 |
| D | 28,875.00 | 40,714.20 | 2,887.50 |
| E | 28,875.00 | 40,714.20 | 2,887.50 |
| F | 17,325.00 | 24,428.00 | 1,732.50 |
| G | 17,325.00 | 24,428.00 | 1,732.50 |
| I | 6,180.00 | 8,713.80 | 618.00 |

Based on testimony introduced at trial, Judge Goldhaber was convinced that the market value of the equipment at the end of the lease term would approximate the 10% option price. The court cited with approval a statement from *In re Crown Cartridge Corp.*, 220 F.Supp. 914 (S.D.N.Y. 1962), that, if "the purchase price bears a resemblance to the fair market price of the property, then the rental payments were in fact designated to be in compensation for the use of the property and the option is recognized as a real one."

▪ In the present case, the leases for the three Great Dane trailers provide that the price at the end of the option period is 10% of the original cost. The option price for the Timpte was not fixed in the lease ($_____) but ¶ 20 gives Boling the option to purchase the trailer "for the estimated Fair Market Value at end of Lease as determined by Lessor." A comparative chart similar to the one in *Universal* appears as follows:

| TRAILER | ORIGINAL COST | TOTAL RENTAL | OPTION PRICE |
|---------|--------------|--------------|--------------|
| 1979 Great Dane | $24,000.00 | $28,596.54 | $2,400.00 |
| 1979 Great Dane | 24,000.00 | 28,596.54 | 2,400.00 |
| 1979 Great Dane | 24,000.00 | 28,596.54 | 2,400.00 |
| 1974 Timpte | 14,500.00 | 17,316.00 | ----- |

Although the evidence presented regarding the market value of the trailers at the end of the lease term is conflicting, I do not find that the option prices are "nominal considerations." To the contrary, I find that market values and option prices are roughly equivalent. Carl Large, who initiated the negotiations between Boling and M & J, testified that the Great Dane trailers would have a salvage value of $2400.00 at the end of the lease term. Boling's witness, who had been selling but not appraising Great Dane trailers for two years, testified that Great Dane trailers of the type leased to Boling would be worth around $9000.00 in five years. Carson Burns, M & J's vice president, testified that the Great Dane trailers would have a value of $2400.00 at the end of the lease term. Boling, in his deposition of January 13, 1981, also indicates that the market value of the Great Dane trailers would be around *$2400.00* at the end of the lease term.[7]

7. Boling responded to questions put forward by M & J's counsel as follows:

Q Okay, but as far as that value [$2400] at the end of that three and a half year period,

Considering the conflicting testimony with regard to market value, I find and conclude that the option price for the purchase of the three Great Dane trailers at the end of the lease term for $2,400.00 bears a reasonable resemblance to the fair market price of the trailers. As in *NYTCO Leasing, Inc. v. Dan-Cleve Corporation*, 31 N.C. App. 634, 230 S.E.2d 559 (1976), M & J is not in the business of manufacturing and selling motor vehicles and trailers. M & J is in the business of leasing vehicles. Boling testified both in his deposition and at trial that he intended to lease the trailers and to purchase them by making a small initial payment. While it is true that Boling may have no "sensible alternative" other than to exercise the option to purchase, the purchase price cannot be said to be "nominal" based upon a comparison of the purchase price with the value of the trailers at the end of the lease period, and the intention of the parties. The three Great Dane trailers are subject to "true leases."

M & J's vice president stated that because of its age the fair market value of the 1974 Timpte at the end of the lease period was not ascertainable. Since it might have "little value," no figure was actually set. In the absence of a fixed amount, ¶ 20, which states that the trailer may be purchased by Boling for the fair market value, controls.

Since the leases involved in the present controversy are true leases and not leases intended for security, it is not necessary to consider the second issue raised by M & J, i. e., whether under North Carolina law Boling was never the "owner" of the trailers but only a party to executory contracts or leases, and perfection of a "security interest" by M & J was not required.

This Memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 752.

is that a fair market value for that trailer at that time?
A  I'd say it would be, yes.
Q  And you are in the trucking business; you know trucks is all I am trying to get to, you know trucks, and that would be a fair value at that time?
A  I'm not an authority and I'm not going to claim to be, an appraiser, but I'd say it would be a fair—
Q  But you are in the business, and you know trucks and you keep them?
A  I try to.
Jan. 13, 1981 Deposition of Charles M. Boling, Page 36.

Q  I would like to ask you one other question then. Based on your knowledge and, in line with what I asked you awhile ago, do you think $2,400.00 would be a fair market value for those three Great Dane trailers, which is what it says, at the end of that forty-two month period, as best you could determine in June of 1980 for the value of that truck forty-two months later?
A  Yes, sir, I'd say it would be. They would be worth that. . . .
Page 44.