**In re Louis C. TUCKER and Roxie Tucker, Debtors.**

**Bankruptcy No. Bk–83–00090.**

United States Bankruptcy Court,
W.D. Oklahoma.

Oct. 27, 1983.

William C. Bowlby and Douglas N. Gould of Fagin, Hewett, Mathews & Fagin, Oklahoma City, Okl., for debtors.

Michael P. Sullivan of Leach, Sullivan, Green & Buston, Duncan, Okl., for First Bank and Trust Co. of Duncan.

Robert M. Peregrin of Ames, Daugherty, Black, Ashabranner, Rogers & Fowler, Oklahoma City, Okl., for Polaris Leasing Co.

Glennella P. Doss, Tulsa, Okl., for Marshall Supply and Equipment Co.

## MEMORANDUM DECISION AND ORDER

RICHARD L. BOHANON, Bankruptcy Judge.

The debtors in this case have filed their plan under Chapter 13 of the Bankruptcy

Code and now seek confirmation. Three creditors affected by the plan, First Bank & Trust Company of Duncan, Oklahoma; Marshall Supply and Equipment Company; and Polaris Leasing Company have timely filed objections to the plan and amendments thereto. The Court has held an evidentiary hearing on the plan and heard arguments of counsel.

The debtors filed their joint petition under Chapter 13 on January 12, 1983. Mr. Tucker currently describes himself as a laborer, but formerly was employed as a skilled machinist with several years experience in the oil equipment business. Mrs. Tucker is disabled, and now receives disability income from an employer. Prior to bankruptcy the debtors owned and operated a machine shop whose business depended primarily on the oil industry. This business provided the debtors with income, but the business failed following reverses in the industry. Mr. Tucker initially was employed at Kirkpatrick's Furniture Company as a laborer until that employment terminated when that company terminated business. At the hearing he testified Linn Construction Company has hired him as a laborer at the rate of $5 per hour.

It is uncontroverted that the debtors executed a promissory note and two renewal notes with First Bank & Trust Company of Duncan. As a result of these notes, the debtors granted a security interest in a mobile home, a pick-up truck and a mortgage on improved real property. No issue has been raised regarding perfection of any of these security interests.

In connection with the debtors' machine shop business two equipment leases were executed. The first lease was entered into on September 7, 1978 and described the items as a lathe and various pieces of equipment. This lease was made with Marshall Supply & Equipment Company, but subsequently was assigned to Litton Industries Credit Corporation. The second lease was entered into on January 25, 1979 between the debtors and Polaris Leasing Corporation. The items described in this lease are a lathe, horizontal saw and a drill.

The objections to confirmation filed by the creditors raise several issues including whether the leases are "true leases" and whether the debtors' plan comports with provisions of the Bankruptcy Code. We will separately address the questions posed by the objecting creditors.

First we consider the contention that the lease agreement between the debtors and Polaris was a "true leases" or whether it should be construed a security interest.[1] Each of the leases provide which state laws should control with regard to matters relating to the lease. The Polaris lease states that Kansas law shall control, while the Marshall lease provides that it will be governed by New York law. However, for our purposes here both Kansas and New York, as well as Oklahoma, have adopted some formulation of the Uniform Commercial Code.[2] Each of these states have language quite similar to that found in § 1–207(37) of the UCC defining when a lease is intended as a security. Therefore, finding little, if any, distinction among these various state provisions we proceed to examine the lease at issue from a general UCC perspective.

The UCC at § 1–201(37) and each state counterpart thereof provides in pertinent part:

> Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee

---

1. We do not address the question of the Marshall lease being a true lease or not since documents filed in the case by Marshall indicates it retained a "security interest" in the equipment and it provided no evidence at the hearing which tended to prove the lease to be a "true lease". Thus, our discussion here pertains in large measure only to the Polaris lease.

2. The statutes in both Kansas and Oklahoma are almost identical as to when a lease is intended as security. *Compare* 12A O.S.1981 § 1–207(37) *with* Kan.Stat.Ann. § 84–1–201(37).

shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

In measuring the intent spoken of in the UCC the standard used is one of objective rather than subjective measurement. *In re Shangri-la Nursing Center, Inc.,* 31 B.R. 367 (Bkrtcy.E.D.N.Y.1983). Although denominated a "lease" the terms of such agreements may be such that a security interest is created. *Percival Construction Co. v. Miller & Miller Auctioneers,* 532 F.2d 166 (10th Cir.1976). In the final analysis, the facts of each case will be determinative of whether a true lease or security interest was created.

In our review of the case law of other jurisdictions three related tests have emerged. Some courts have adopted the "economic realities" test set forth in J. White and R. Summers, *Handbook of the Law Under the Uniform Commercial Code,* § 22–3 at 881 (2d ed. 1980). This test looks to what is economically sensible at the end of the lease term. If the only economically sensible course is for the lessee to exercise the option to purchase the property, then the agreement is a security agreement. *See Percival Construction Co. v. Miller and Miller Auctioneers, supra; In re International Plastics, Inc.,* 18 B.R. 583 (Bkrtcy.D. Kan.1982); *In re Dunn Bros. Inc.,* 16 B.R. 42 (Bkrtcy.W.D.Va.1981); *In re Duprat,* 28 B.R. 109 (Bkrtcy.D.Vt.1983).

A second approach adopted by some courts examines the relationship between the option price and that of the original purchase or list price. These courts hold that if the option price is less than 25% of the original price the agreement was intended as security since the consideration is regarded as only nominal. *In re AAA Machine Company, Inc.,* 30 B.R. 323 (Bkrtcy.S. D.Fla.1983); *Matter of Fashion Optical, Ltd.,* 653 F.2d 1385 (10th Cir.1981); *In re Boling,* 13 B.R. 39 (Bkrtcy.D.Tenn.1981).

Finally, a lesser used test finds some courts comparing the option price to the fair market price of the equipment at the point when the option is exercised. *See Matter of Fashion Optical, Ltd., supra; In re Boling, supra; cf. In re International Plastics, Inc., supra.* Under this test if the purchase price of the property at the end of the lease term is approximately equal to the market value the agreement is held to be a true lease.

Turning to the case at bar, we find that applying either of these tests the conclusion would have to be that the lease agreement at issue must be considered as a security interest. Neither of the agreements contained a written option to purchase, however verbal options were discussed and subsequently agreed to by all parties. Therefore, we find that the written lease contracts were not the complete agreements. However, we point out that even if the lease did not contain a purchase option, the lease would still be deemed one intended as security if the facts otherwise expose economic realities tending to confirm that a secured transfer of ownership is afoot. *In re Tulsa Port Warehouse Co., Inc.,* 690 F.2d 809 (10th Cir.1982).

Courts have looked to many factors which tend to indicate whether a lease is in reality a secured transaction. If the lessee may be identified as the party who has the real interest in the disposition of the equipment there is indicia of a secured transaction. *In re Tulsa Port Warehouse Co., Inc.,* 4 B.R. 801 (D.N.D.Okl.1980). Conversely, if at the end of the lease term the owner has the absolute right to retake control and use the property this characterizes a true lease arrangement. *Id.* at 805.

Some additional factors tending to indicate a true lease are:

(a) if the purchase option price approximates the market value at the time of exercise of the option,

(b) rental charges indicate intention to compensate lessor for loss of value over term of lease due to normal aging and obsolescence,

(c) rentals which are not excessive and option purchase price that is not too low, and

(d) if facts demonstrate lessee is acquiring no equity in leased items during term of lease

See Matter of Fashion Optical, Ltd., supra; Percival Construction Co. v. Miller & Miller Auctioneers, Inc., supra.

■ Among those factors which tend to indicate the lease is a secured transaction are the following:

(a) whether the lessee is required to insure the items on behalf of the lessor in an amount equal to the total rental payments,

(b) if risk of loss or damage is on the lessee,

(c) if lessee is to pay for taxes, repairs, damage and maintenance,

(d) whether there exist default provisions governing acceleration and resale of the item,

(e) whether there exists a substantial non-refundable deposit requirement,

(f) when goods are to be selected from a third party by the lessee,

(g) rental payments are a reasonable equivalent of the cost of the items plus interest,

(h) the lease is to be discounted with a bank, and

(i) warranties generally found in a lease are excluded by the agreement

United States ex rel. Eddies Sales and Leasing, Inc. v. Federal Ins. Co., 634 F.2d 1050 (10th Cir.1980); In re Winston Mills, Inc., 6 B.R. 587 (Bkrtcy.S.D.N.Y.1980); see also J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code § 22–3 at 882–83 (2d ed. 1980).

An examination of the lease with Polaris Leasing Corporation demonstrates that this agreement meets virtually every test factor tending to indicate the lease is a secured transaction. The lease provides the lessee shall keep the equipment insured at full value for the term of the lease. The contract imposes risk of loss entirely upon the lessee. The tax provisions of the lease places the burden of taxes, assessments and other governmental charges upon the lessee.[3] Likewise, the lessor has no obligation to make any repairs or replacement of the equipment and lessee bears the expense of all repairs, maintenance, operation and replacements. The default provisions give considerable leverage to the lessor and establish guidelines for resale of the equipment. The warranties section specifically disclaims any and all warranties and representations with respect to the equipment and emphasizes that the lessee was the party that selected the equipment. The Polaris lease stipulates the lessee was to pay in advance approximately $8,000 in rentals prior to commencing monthly payments. Finally, the monthly payments under the lease calculate to an amount which approximates the cost of the equipment plus interest.

The debtors testimony at the hearing was that but for their ability to purchase the equipment on favorable terms connected with the lease they would not have entered into the transaction. This expectation is highly reasonable since the only economically sensible course for these debtors to take would be to exercise the option to purchase once having made substantial rental payments. Cf. In re Shangri-la Nursing Center, Inc., supra; In re AAA Machine Co., Inc., supra; Matter of Fashions Opticals, Inc., supra; Citicorp Leasing, Inc. v. Allied Institutional Distributors, Inc., 454 F.Supp. 511 (D.W.D.Okl.1977).

Polaris admits it allowed the debtors the opportunity to purchase the equipment by paying future rentals, discounting the rentals by the rule of 78's, applying any investment tax credit recaptured by Polaris and adding the salvage value, established at 10% of the original cost of the equipment. In substance this provision would allow the debtors to purchase the equipment for a

**3.** Polaris however has asserted, without objection, that it paid all investment taxes on the equipment.

price approximately 10% of its original cost.[4] When the purchase option price is less than 25% of the list price, the consideration is deemed nominal and the lease is ordinarily one intended for security. *Equico Lessors, Inc. v. Wetsel,* 576 F.Supp. 13 (D.W.D.Okl.1983); *Matter of Fashion Optical, Ltd., supra; Percival Construction Co v. Miller & Miller Auctioneers, Inc., supra.*

Although the lease contains some indicia of a true lease such as questionable equity realized by the lessee, the fact the lessor took an investment tax credit and the lessee has deducted lease rentals for income tax purposes, these few indicators are not persuasive compared with the volley of indicators of a security. Each case must turn on its own facts and on balance we find the lease in this case was but a disguised security interest.

This holding, however, does not end our inquiry for we find the debtors' plan cannot be confirmed for other significant reasons appropriately raised by the creditors. First, we have serious questions regarding the debtors' compliance with requirement to prove a regular and stable income to be eligible as a Chapter 13 debtor. 11 U.S.C. § 109(e). At the hearing the testimony was that Mrs. Tucker was disabled and was currently receiving disability payments. No testimony was received which would indicate how long these payments would continue or allay other possible contingencies which would negatively impact upon this prospective income source. *Compare In re Devall,* 9 B.R. 41 (Bkrtcy.M.D.Ala.1980). (Social Security benefits found sufficient to allow debtor to work out Chapter 13 plan). For the foreseeable future Mr. Tucker is not expected to work in his skilled field as a machinist, but is resigned to perform laborers' tasks. Since the filing of the petition he has changed jobs due to his employer's terminating business, and at the hearing could speak only of part-time employment at his new job.

Section 101(24) of the Code defines "individual with regular income" to mean one whose income is *sufficiently stable* and regular to enable such individual to make payments under a plan. Although the regular and stable income provision should be liberally construed, we hesitate to rely on mere hopes of maintaining employment. Our determination of what constitutes "regular income" is not limited to the date of filing the petition, but may properly be viewed prospectively. *In re Troyer,* 24 B.R. 727 (Bkrtcy.N.D.Ohio 1982). Thus our concern becomes not one of simply fluctuations of income, but whether there will be any reliable income to fund the proposed plan.

It is incumbent upon a Chapter 13 debtor to sufficiently demonstrate an ability to fund the plan from sources which are stable and regular. *In re McGowan,* 24 B.R. 73 (Bkrtcy.N.D.Ohio 1982). This condition is mandated by the Bankruptcy Code "because such income becomes property of the estate, and permits the debtor to accomplish the ultimate goal of Chapter 13, that being the distribution of a larger dividend to creditors than would have been possible had the debtor liquidated under 11 U.S.C. Chapter 7." *Margraf v. Oliver,* 28 B.R. 420, 424 (Bkrtcy.S.D.Ohio 1983). Upon the record and circumstances before us we cannot find the debtors to have a sufficiently stable and regular income as required by the Code.

Our final consideration of this matter goes to the question of feasibility of the debtors' plan. One of the important requirements for confirmation of a Chapter 13 plan is the debtors' ability to make all payments under the plan and to comply with the plan. 11 U.S.C. § 1325(a)(6). This requirement is commonly referred to as the "feasibility requirement" in a Chapter 13 case.

The debtors' modified plan calls for payment of all creditors in full with secured creditors retaining their security interest in mortgaged property. All creditors are to

---

**4.** This calculation assumes that unpaid rental payments would not be considered added to the salvage value as a basis of the option to purchase. Of course we recognize the debtors to be liable for payments under terms of the rental agreement irrespective of the option.

receive the full amount of their claim from an assumed sale of assets. These assets include a house trailer, pick-up truck and two tracts of real estate. In addition, the debtors propose to pay into the plan $250 per month for distribution on a pro-rata basis to all creditors.

Debtors list $82,396 in debts to secured creditors, $10,018 in unsecured debts [5] and a $600 disputed claim. The debtors have valued the asset property as follows: Mobile home: $6,700; Truck: $10,500; Real property: $55,000 and $15,000 each. Additionally, $230 is monthly income which the debtors derive from rental received from a relative.[6]

The bank, which has liens on the debtors' real property, pick-up truck and mobile home, argues that the debtors' plan is too speculative to be confirmed. We agree with this position. First, assuming the values placed on the asset property intended for sale are realistic,[7] the entire plan rests upon realizing these values. While we do not question that claims of the debtors may be satisfied from sale of property of the estate or debtor, see 11 U.S.C. § 1322(b)(8), we do not think hypothetical propositions are sufficient in and of themselves. The debtors must do more than simply state that assets will be sold sometime in the future, they must bear the burden of showing a likelihood of consummating their proposed sale. Cf. In re Gavia, 24 B.R. 573, 574 (Bkrtcy.App. 9th Cir.1982). The debtors seek additional time in which to sell the property, but suggest no efforts they have made to obtain the asking price of the real property and offered dubious proposals as to the other assets. Their marketing efforts here are not compelling, and proposed sale of assets in a depressed market does

not help their argument. See In re Gavia at 574.

Because we find the plan not feasible and the debtors not eligible under Chapter 13 due to not having steady and regular income, it is unnecessary to reach the other grounds of objections asserted by the creditors. We intimate no position on the question of "good faith" or "cram down" raised by the bank, nor related issues suggested by Polaris or Marshall.

The creditors in this case have requested dismissal of this Chapter 13 petition or alternatively for conversion to a case under Chapter 7. Section 1307 of the Bankruptcy Code provides that upon request of a party in interest and after notice and a hearing the Court may dismiss a case under this chapter if that is in the best interest of creditors and the estate for cause. One of the "for cause" provisions is denial of confirmation of a plan under § 1325. See 11 U.S.C. 1307(c)(4). In light of our holding as stated above we find it in the best interest of both creditors and the estate that this case be dismissed.

Accordingly, for the reasons set forth above it is ordered that the debtors' plan as amended not be confirmed and that this case shall be and hereby, is dismissed.

---

**5.** Including an $8,000 priority claim filed by the IRS against the debtors.

**6.** This rental income would cease once the property was sold since the rental property is located on the subject real estate proposed to be sold.

**7.** The only appraisals on any of the property evidently was done by the bank, but those figures are considerably lower than values claimed by the debtors. In addition, the debtors have flip-flopped on some of their own valuations during the course of their plan and amendments thereof. For the most part the record is void of any reliable valuations of the various properties.