## In re EAGLE ENTERPRISES, INC., and Liberty Recovery Systems, Inc., Debtors.

### Bankruptcy Nos. 98–11297SR, 98–11298SR.

United States Bankruptcy Court, E.D. Pennsylvania, Philadelphia Division.

Aug. 4, 1998.

---

## OPINION

STEPHEN RASLAVICH, Bankruptcy Judge.

### INTRODUCTION

At issue in the present proceeding is the status of three top lifters acquired by one of the debtors shortly before filing bankruptcy. The acquisition of the top lifters was accomplished via a leasing arrangement and the question in dispute is whether the leases are "true leases" or disguised financing agreements. No financing statements were filed by the seller, and thus the trustee asserts that the leases are financing instruments giving rise to avoidable unperfected security interests. The seller proposes that the leases are governed by German law under which they would allegedly be true leases. As explained below, we agree with the trustee. Accordingly, we find that the seller is not entitled to any compensation for the use of the top lifters by the debtor or the trustee and there is no requirement for the leases to be assumed or rejected.

### BACKGROUND

The debtors in this consolidated case, Eagle Enterprises, Inc., and Liberty Recovery Systems, Inc. (collectively referred to as "Debtor"), are two firms formerly engaged in waste management. Following a brief period in Chapter 11, the case was converted to Chapter 7 and Mitchell Miller was appointed trustee ("Trustee") to liquidate the Debtor's assets. At the time of conversion, the Debtor had three top lifters in its possession. Two of the top lifters were inoperable and located at a facility in Philadelphia, Pennsylvania. The third top lifter, located in Virginia, functioned, and, following conversion of the case to Chapter 7, was used in clean-up operations at the Debtor's premises by USA Waste Services, Inc. ("USA"), a secured creditor.

The top lifters were acquired by the Debtor within a year before filing bankruptcy via leasing arrangements with their seller, a German company named United Container Systems (Deutschland) GmbH ("UCS"). The leases, styled "Purchase Lease Agree-

ment[s]," were to last for a period of 36 months and required the Debtor to make quarterly payments of an amount slightly in excess of $16,000 for each top lifter. The leases could not be terminated prior to the end of their 36 month term and included a purchase option allowing the Debtor to acquire ownership of the top lifters for a payment of one dollar each.

UCS has filed two motions. The firsts seeks to have the leases rejected and the property returned. In the second motion, USC seeks compensation from USA for its use of the top lifters during the postpetition period. Both the Trustee and USA oppose the motions. A hearing was held on June 3, 1998, in which the parties orally stipulated to most of the evidence and presented legal argument. Briefs were submitted by all the parties thereafter in support of their respective positions.

USC argues that German law is applicable to the transaction based on a choice of law clause contained in the leases. According to German law, USC asserts that the leases are true leases and that title to the top lifters does not pass to the lessee until the purchase option is exercised at the end of the lease term.[1] USC thus posits that title to the top lifters is not part of the bankruptcy estate and that the leases are executory contracts, governed in bankruptcy by 11 U.S.C. § 365, and susceptible to being assumed or rejected. The Trustee argues that the choice of law clauses in the leases are unenforceable under Pennsylvania's version of the Uniform Commercial Code, 13 Pa.C.S. § 1105(b),[2] which directs that all choice of law issues pertaining to the perfection or nonperfection of security

interests is governed by section 9103. 13 Pa.C.S. § 9103. That section incorporates the Uniform Commercial Code's ("U.C.C.") definition of "security interest" and its application to the present case leads to the conclusion that the leases created security interests that must be filed to become perfected. Hence, the Trustee posits that UCS is the holder of unperfected security interests that are avoidable under the Bankruptcy Code. 11 U.S.C. § 544.

## DISCUSSION

### I.

■ The first issue in deciding any choice of law question is to determine the applicable choice of law rules. In most instances bankruptcy courts rely on the rule observed by federal district courts hearing diversity cases and use the choice of law rules of the forum state. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *M.J. Doyle v. Northrop Corp.*, 455 F.Supp. 1318, 1326 (D.N.J.1978); *In re High–Line Aviation, Inc.*, 149 B.R. 730, 733 & n. 2 (Bankr.N.D.Ga. 1992). Both contestants in the present case have argued on the basis of Pennsylvania law and thus appear implicitly to agree that Pennsylvania's choice of law rules govern the case's resolution. The Court accepts the parties' position.

The controlling law in Pennsylvania with respect to conflicts of laws problems involving secured transactions under the U.C.C. is 13 Pa.C.S. § 1105. That section, which

1. UCS submitted an affidavit of a German lawyer explaining that under German law title to the top lifters would not pass to a purchaser until the end of the lease term. The court's initial reaction to the affidavit was to sustain the Trustee's hearsay objection and not admit the affidavit into evidence. The court has subsequently researched the matter and come to understand that under Bankruptcy Rule of Procedure 9017, incorporating Fed.R.Civ.Pro. 44.1, the Court is permitted to use any source to determine foreign law regardless of the rules of evidence. Accordingly, the Court accepts for purposes of this opinion that under German law the UCS leases would not have transferred title of the top lifters to the Debtor. *See Kalmich v. Bruno*, 553 F.2d 549 (7th Cir.1977) (unsworn opinion letter of

foreign attorney properly considered as proof of foreign law).

2. In the Pennsylvania Consolidated Statutes, the dash between the first and second numbers of U.C.C. sections is deleted. Thus, references in this Opinion to U.C.C. sections without dashes are references to Pennsylvania law. Where references to U.C.C. sections include dashes between the first and second numbers those references are to the U.C.C. as adopted in other jurisdictions made in accordance with that jurisdiction's stylistic conventions. Whose law is being cited should appear obvious based on the contexts of the discussion.

states choice of law rules of general applicability, reads as follows:

### 1105. Territorial application of title; power of parties to choose applicable law

(a) General rule.—Except as otherwise provided in this section, when a transaction bears a reasonable relation to this Commonwealth and also to another state or nation the parties may agree that the law either of this Commonwealth or of such other state or nation shall govern their rights and duties. Failing such agreement this title applies to transactions bearing an appropriate relation to this Commonwealth.

(b) Limitations on power of parties to choose applicable law.—Where one of the following provisions of this title specifies the applicable law, that provision governs and a contrary agreement is effective only to the extent permitted by the law (including the conflict of laws rules) so specified:

Section 2402 (relating to rights of creditors of seller against sold goods).

Sections 2A105 (relating to territorial application of division to goods covered by certificate of title) and 2A106 (relating to limitation on power of parties to consumer lease to choose applicable law and judicial forum).

Section 4102 (relating to applicability of division on bank deposits and collections).

Section 4A507 (relating to choice of law).

Section 8110 (relating to applicability; choice of law).

*Section 9103 (relating to perfection provisions of division on secured transactions).*

*Id.* (emphasis added).

UCS grasps onto section 1105(a) for the proposition that parties to a contract are permitted to choose the law to be applied to their agreement as long as it bears a reasonable relationship to the transaction. Since UCS is a German company, it claims that German law bears a reasonable relationship to the transaction at issue and must be applied to govern its terms in accordance with the contract.

■ While the Court finds that UCS is generally correct in its summary of the law, the Court nevertheless concludes in this instance that UCS is reading more into the statute than is actually there. Section 1105(a) allows contracting parties to choose the law applicable to *"their"* relationship. The statute is silent, however, on the issue of whether parties may also make choice of law decisions that impact the rights of third parties who have not signed on to their contract. Fundamental principals of contract law, including most notably the rules governing offer and acceptance, strongly militate that they cannot. *See Perry v. Tioga County,* 694 A.2d 1176, 1178 (Pa.Cmwlth.Ct.1997) (offer and acceptance necessary elements of an enforceable agreement). A third party, that is, cannot have his rights altered, compromised or redefined by the provisions of a contract he has not accepted. *See Hahnemann Medical College and Hospital of Philadelphia v. Hubbard,* 267 Pa.Super. 436, 440, 406 A.2d 1120, 1122 (1979) (contract not binding without offer and acceptance). In the context of the instant Chapter 7 bankruptcy proceeding, the Trustee stands in the role of a third party as a representative of all creditors, 3 Collier on Bankruptcy ¶ 323.02[1] (15th ed.1998), and is specifically given the powers of a judicial lien creditor under 11 U.S.C. § 544. The Trustee, thus, is a third party whose rights cannot be governed by UCS's contract with the Debtor.

■ Moreover, even if contracting parties could use Section 1105(a) to impose contractual choice of law decisions on third parties, section 1105(b) expressly makes those choice of law decisions inapplicable to issues concerning the perfection of security interests under 13 Pa.C.S. § 9103. That section contains specific choice of law provisions to determine the law applicable to the perfection of security interests in transactions with multi-state contacts. At first blush the section may appear inapposite to the present controversy because it concerns the perfection of security interests, whereas the issue raised in this case relates to the classification of a transaction as a security agreement or lease. Nevertheless, section 9103 does contain the answer to the question. The answer lies in the fact that section 9103 references and

thereby incorporates the law applicable to the classification of security agreements through its use of the term "security interest." Under the U.C.C., "security interest" is a term of art defined in section 1201, 13 Pa.C.S. § 1201, as "an interest in personal property or fixtures which secures payment or performance of an obligation." *Id.* According to the first paragraph of section 1201, the definitions provided therein "shall" govern the meaning of the terms as used throughout the U.C.C. *Id.*[3] With reference to the present case, the definition of "security interest" contains the following pertinent provisions:

**(2) Retention or reservation of title to delivered goods.**—The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (section 2401) is limited in effect to a reservation of a "security interest."

. . .

**(6) Determination of lease or security interest.**—Whether a transaction creates a lease or security interest is determined by the facts of each case; however:

*(i) A transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee and:*

(A) the original term of the lease is equal to or greater than the remaining economic life of the goods;

(B) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;

(C) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement; or

*(D) the lessee has an option to become the owner of the goods for no*

*additional consideration or nominal additional consideration upon compliance with the lease agreement.*

*Id.*

Thus, the definition of "security interest" itself contains all of the rules applicable under the U.C.C. for determining whether an agreement is a "true lease" or security agreement. Since the term "security interest" is employed by section 9103, its definition is incorporated into the section and must be applied to any potential security agreement as the first step in the process of determining whether the choice of law rules contained in 9103 are applicable thereto. Accordingly, Pennsylvania law for classifying security interests is applicable to the Debtor's agreement with UCS through the operation of 13 Pa.C.S. § 9103 which applies to "security interests" and is made applicable to the parties' agreement by section 1105(b).

The cases addressing the issue are fairly uniform in holding that contractual choice of law provisions are not binding on third parties or otherwise capable of effecting the reclassification of security agreements into leases. *Carlson v. Tandy Computer Leasing,* 803 F.2d 391, 393 (8th Cir.1986); *Hong Kong and Shanghai Banking Corp. v. HFH USA Corp.,* 805 F.Supp. 133, 140 (W.D.N.Y. 1992); *In re Automated Bookbinding Services, Inc.,* 336 F.Supp. 1128, 1132 (D.Md. 1972), *rev'd on other grounds,* 471 F.2d 546; *In re Kokomo Times Publishing and Printing Corp.,* 301 F.Supp. 529, 536 (S.D.Ind. 1968); *In re High–Line Aviation, Inc.,* 149 B.R. 730, 735 (Bankr.N.D.Ga.1992); *In re Wathen's Elevators, Inc.,* 32 B.R. 912, 919 n. 16 (Bankr.W.D.Ky.1983); *In re Vintero Corp.,* 31 UCC Rep.Serv. (CBC) 1145 (Bankr. S.D.N.Y.1980); *Industrial Packaging Products Co. v. Fort Pitt Packaging International, Inc.,* 399 Pa. 643, 647, 161 A.2d 19, 21 (1960). *See generally* J.C. Rozendaal, Note, *Choice of Law in Distinguishing Leases from Security Interests Under the Uniform Commercial Code,* 75 Tex.L.Rev. 375 (1996).

**3.** To be specific, the section states: "[T]he following words and phrases when used in this title shall have, unless the context clearly indicates otherwise, the meanings given to them in this section" 13 Pa.C.S. § 1201. There is nothing in the context of section 9103 to indicate to any degree that the definition of "security interest" as provided in section 1201 is not applicable to the term as used in the former section.

The case most on point with the present controversy is *Hong Kong and Shanghai Banking Corp. v. HFH USA Corp.*, 805 F.Supp. at 133. That case involved a priority dispute between a German company that sold goods to an American firm which later became encumbered by a consensual lien from a third party creditor. The German company sold the goods under an agreement that adopted German law and contained a title retention clause. Applying German law, the company argued it held an ownership interest in the property superior to the lien of the third party creditor even though the company never recorded a financing statement in accordance with the U.C.C. as adopted in New York.

The court held that the dispute was governed by New York law and that the German company's interest in the goods was inferior to the third party creditor who had a perfected security interest. In pertinent part, the court stated:

> Under normal circumstances, contracting parties are free to stipulate what state's or nation's law will govern their contractual rights and duties, provided that the state or nation has a reasonable relationship with the transaction, and the law chosen does not violate a fundamental public policy of the forum state. *Siegelman v. Cunard White Star, Ltd.*, 221 F.2d 189 (2d Cir.1955); *Culbert v. Rols Capital Co.*, 184 A.D.2d 612, 585 N.Y.S.2d 67 (2d Dep't 1992). Nonetheless, the parties' stipulation will not be regarded where it would operate to the detriment of strangers to the agreement, such as creditors or lienholders. *Broadcasting Rights International Corp. v. Societe du Tour de France*, 675 F.Supp. 1439, 1448 (S.D.N.Y.1987); *Carlson v. Tandy Computer Leasing*, 803 F.2d 391 (8th Cir.1986). Where the rights of third parties are implicated, the court should be governed by the ordinary rule that the federal district courts apply the choice of law rules of the state in which they sit. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The district court must apply the law it believes the state's highest court would apply.

*Id.* 805 F.Supp. at 139–40. The court continued its analysis of the choice of law question under section 1–105(b) of New York's U.C.C. The court's analysis of the issue under that section differs from this Court's, however, because New York had not yet updated its U.C.C. to include the 1972 amendments. Under the version of the U.C.C. in place in New York at the time of the decision, the final clause of section 1105(b) set forth the secured transactions exception to choice of law agreements as follows, "Policy and scope of the Articles on Secured Transactions. Sections 9–102 and 9–103." *Id.* at 140. Thus, instead of focusing its analysis on section 9–103, the court concentrated on section 9–102 and concluded that it mandated the application of New York law. Section 9–102 is a provision broadly stating that Article 9 applies to all transactions involving the creation of security interests in personal property and provided ample basis for the court's decision to apply Article 9 to the contract before it. Having concluded that section 9–102 mandated the application of New York law, the court did not continue its analysis under section 9–103.

In Pennsylvania, the 1972 amendments to the U.C.C. changed the text of the final choice of law exception in 1105(b) from, "Sections 9102, 9103 (relating to policy and scope of division on secured transactions)," 13 Pa. C.S. § 1105 (Historical Note), to "Section 9103 (relating to perfection provisions of division on secured transactions)." *Id.* § 1105(b). By enacting this amendment the legislature appears to have made the scope of the exception for secured transactions narrower by limiting the excepted sections of Article 9 to only 9103. Nevertheless, as demonstrated by the analysis above, section 9103 is itself sufficient to mandate the application of Pennsylvania law relating to the characterization of leases to the present dispute.

The commentary accompanying the amendment does not demonstrate that the change to the statute was meant to have a substantive effect. The commentary to section 1105 states:

> The reference to Section 9–102 has been deleted and a change made in Section 9–

102 deleting any reference therein to conflict of law problems, because there is no reason why the general principles of the present section should not be applicable to the choice of law problems within its scope. 13 Pa.C.S. § 1105 (Official U.C.C. Reasons for 1972 Changes). The commentary explaining the 1972 amendments to section 9102 says, "[t]he omission in the first paragraph of subsection (1) make applicable the general choice of law principles of Section 1–105 (except for special rules in Section 9–103), instead of an incomplete statement in this section." 13 Pa.C.S. § 9102 (Official U.C.C. Reasons for 1972 Changes). With respect to section 9103, the commentary states that the section was,

> completely rewritten [in 1972] to clarify the relationship of its several provisions to each other and to other sections defining the applicable law. Now that the Code has been adopted in all states but Louisiana and also adopted in the District of Columbia and the Virgin islands, the emphasis in the revision has been to make clear where perfection of a security interest must take place, rather than on problems of actual conflicts of rules of law.

13 Pa.C.S. § 9103 (Official U.C.C. Reasons for 1972 Changes). Taken together these comments indicate that the amendment to section 1105(b), deleting reference to 9102, was done more for the purpose of reorganizing and centralizing the choice of law rules to one code section rather than to effect a change in the law.

The substantive comment to section 1105 expresses a strong need for the uniform and consistent application of Article 9, stating:

> Subsection (2) [1105(b) ] spells out essential limitations on the parties' right to choose the applicable law. *Especially in Article 9 parties taking a security interest or asked to extend credit which may be subject to a security interest must have sure ways to find out whether and where to file and where to look for possible existing filings.*

13 Pa.C.S. § 1305 (Uniform Commercial Code Comment—1972 ¶ 5) (emphasis added). This comment makes clear that one uniformly applicable law is necessary to make Article 9 function as intended. Only one law, applied in a uniform manner, can assure the existence of a comprehensive filing system upon which parties may rely with confidence when dealing in secured transactions. The need for uniformity as expressed in the comment illustrates the importance of applying the definition of "security interest" in section 1201 to the term as it is used in section 9103. The application of a uniform definition assures that all contracts susceptible to section 9103 will be treated in a similar manner based on their substance. All agreements which function as security devices will be classified as security agreements and made subject to the U.C.C.'s filing requirements. This treatment will in turn help eliminate the existence of secret liens that degrade the reliability of U.C.C. filing indexes and ultimately impede commerce.

The court in *Carlson v. Tandy Computer Leasing*, 803 F.2d 391 (8th Cir.1986), also dealt with a conflict of laws dispute concerning the classification of a lease as a disguised financing agreement. In this case the dispute was between a lessee located in Missouri and a lessor located in Texas. The lease specified that it was governed by Texas law. After the lessee filed bankruptcy, the trustee brought an action against the lessor ·claiming that its lease was an unperfected security agreement. On appeal, the Eighth Circuit concluded that Missouri law was controlling. The court disregarded the choice of law stipulation in the lease on the rationale that it was not binding on third parties and then reasoned that Missouri law was applicable based on the unamended provisions of section 1–105(2) and 9–102 of the Missouri U.C.C. *Carlson*, 803 F.2d at 394 (citing Mo. Rev.Stat. § 400.1–105 (1978) (amended)). In reaching its decision, the court stated:

> The policy behind section 1–105(2), especially as it relates to the scope of Article 9 of the Missouri U.C.C., is to prohibit choice of law agreements when the rights of third parties are at stake. *See* Mo.Ann.Stat. S 400.1–105(2) Uniform Commercial Code Comment 5 (Vernon 1965). If we applied Texas law to determine whether a security interest existed here, this would violate a fundamental purpose of Article 9: to cre-

ate commercial certainty and predictability by allowing third party creditors to rely on the specific perfection and priority rules that govern collateral within the scope of Article 9. In order to prevent the constant unilateral expansion and contraction of the scope of Missouri's Article 9, a Missouri court would apply Missouri law to determine the scope of Article 9 of the Missouri U.C.C.

*Carlson*, 803 F.2d at 394. Applying Missouri law the court ultimately concluded that the lease was a true lease to which Article 9 did not apply.

In *Industrial Packaging Products Co. v. Fort Pitt Packaging International*, 399 Pa. 643, 161 A.2d 19 (1960), the Pennsylvania Supreme Court issued an opinion addressing choice of law involving secured transactions. In this case, a state court appointed receiver for a company located in Pennsylvania challenged the perfected status of a New York based creditor. Relying on a choice of law clause in its contract, the creditor argued for the application of New York law. The Supreme Court, however, determined that the status of the creditor's security interest had to be judged under Pennsylvania law. The court relied upon section 9103 of the U.C.C. as then in force to hold that Pennsylvania law governed the transaction. At that time, section 9103 provided that Article 9 governed the validity and perfection of security interests when the office where an assignor keeps its records is in this state. The court rejected the creditor's argument that its choice of law clause was enforceable, stating:

> We agree with the court below that 'as between parties it is lawful for them to agree as to what law shall apply; but where, as here, we are dealing with the rights of creditors in the property of one of the contracting parties, then the law of the state of such party's domicile or place of business shall apply. Otherwise, it would be possible for two parties to render nugatory as to third parties an act of Assembly passed for the benefit of such third parties.' The laws of Pennsylvania, not New York, governs this controversy.

*Fort Pitt*, 399 Pa. at 647, 161 A.2d at 21.

The cases UCS cites in support of enforcing the choice of law provision in its contracts are not persuasive. *Citi–Lease Company v. Entertainment Family Style, Inc.*, 825 F.2d 1497 (11th Cir.1987); *In re Pacific Express, Inc.*, 780 F.2d 1482 (9th Cir.1986); *In re Lykes Bros. Steamship Co.*, 196 B.R. 574 (Bankr.M.D.Fla.1996), *In re Wall Tire Distributors*, 116 B.R. 867 (Bankr.M.D.Ga.1990), and *In re O.P.M. Leasing Services, Inc.*, 23 B.R. 104 (Bankr.S.D.N.Y.1982), all lack authoritative force because each case involves an instance in which the parties' contractual choice of law was uncontested. The courts in the cases simply applied the parties' contractual choice of law without analysis.

*In re Boling* 13 B.R. 39 (Bankr.E.D.Tenn. 1981), is the single case cited by UCS that contains an actual analysis of the choice of law issue. The case is potentially distinguishable, however, because it involves a dispute between the original parties to a purported lease agreement, and thus the rights of third parties were not directly at stake. This distinction is not clear cut, though, because the debtor was acting as a debtor-in-possession and attempting to exercise the trustee's strong-arm powers under section 544 of the Bankruptcy Code and could potentially be viewed as representing the interests of creditors in general. Nevertheless, to the extent the case is not distinguishable, the Court declines to follow *Boling* because its reasoning is not persuasive.

The *Boling* court was faced with deciding whether a transaction with multi-state contacts was a lease or security interest and in the process decided to honor the parties' contractual stipulation on choice of law. The case involved a debtor located in the forum state of Tennessee and a seller/lessor located in North Carolina. The debtor had acquired possession of tractor trailers from the North Carolina entity pursuant to agreements purporting to be leases. The leases contained a choice of law clause mandating the application of North Carolina law. In reaching its decision to apply North Carolina law the court reiterated the familiar teachings of U.C.C. section 1–105 (identified by the court under Tennessee law as T.C.A. § 47–1–105) observing that parties are free to choose the law to govern their agreements except as

otherwise directed by the specific U.C.C. sections identified in 1–105(2). The court recognized that under the unamended version of 1–105(2) sections 9–102 and 9–103 of Article 9 were excepted from the parties' choice of law decisions. Nevertheless, the court declined to apply Tennessee law to the case, apparently reasoning that the characterization of the contract as a lease or security agreement was not an issue governed by Article 9 and thus was not effected by the exceptions in 1–105(2). The court did not address the issue of whether the rights of third parties were effected.

This Court declines to follow *Boling* for two reasons. First, the rights of third parties are at issue whenever a trustee is attempting to use the Bankruptcy Code's strong-arm powers to avoid a security interest. The unsecured creditors who will reap the benefit of the avoided lien are not parties to the security agreement and thus cannot have their rights altered thereby. *Fort Pitt Packaging International,* 399 Pa. at 643, 161 A.2d at 19. Secondly, as explained above, issues concerning the characterization of contracts as leases or security agreements do come under the auspices of Article 9 through the use of the term "security interest" in section 9–103. The *Boling* court rejected the application of section 9–103 on its face without considering its interaction with section 1–201. In the context of the *Boling* decision, the failure to recognize the interaction between the two sections was probably inconsequential because both jurisdictions, North Carolina and Tennessee, had adopted the U.C.C. and thus possessed similar if not identical laws. When dealing with a foreign jurisdiction, however, such as Germany in the present case, the interplay between sections 9103 and 1201 is critical and must be observed.

## II.

■ The application of section 9103 in the present case shows that the UCS leases are security agreements governed by Pennsylvania law and must be filed to be perfected. In pertinent part, section 9103 states:

**9103. Perfection of security interests in multiple state transactions**

(a) Documents, instruments and ordinary goods.—

(1) This subsection applies to documents and instruments and to goods other than those covered by a certificate of title described in subsection (b), mobile goods described in subsection (c) and minerals described in subsection (e).

(2) Except as otherwise provided in this subsection, perfection and the effect of perfection or nonperfection of a *security interest* in collateral are governed by the law of the jurisdiction where the collateral is when the last event occurs on which is based the assertion that the security interest is perfected or unperfected.

(3) If the parties to a transaction creating a purchase money *security interest* in goods in one jurisdiction understand at the time that the security interest attaches that the goods will be kept in another jurisdiction, then the law of the other jurisdiction governs the perfection and the effect of perfection or nonperfection of the security interest from the time it attaches until 30 days after the debtor receives possession of the goods and thereafter if the goods are taken to the other jurisdiction before the end of the 30–day period.

13 Pa.C.S. § 9103 (emphasis added).

As indicated, section 9103 refers to agreements which create "security interests" and thus the first step in applying the section is to determine whether a particular agreement creates a security interest within the meaning of the U.C.C. The bankruptcy court in *In re Lerch,* 147 B.R. 455 (Bankr.C.D.Ill.1992), interpreting the U.C.C. as enacted in Illinois, made the following useful observations with reference to the definition of "security interest," which is set forth in this opinion at pages 293–294, *supra:*

The initial portion of the first sentence of the second unnumbered paragraph [subsection (6)(i) under the definition of "security interest" in 13 Pa.C.S. § 1201] contains the basic direction that the determination is made based on the facts of each case. The latter portion of the first sentence of the second unnumbered para-

graph starting with the word "however" creates an exception to the basic direction that the determination is made on the facts of each case, as it provides that without looking at all the facts, a lease will be construed as a security interest if a debtor cannot terminate the lease, and if one of the four enumerated terms is present in the lease.

Absent a mandated classification, the determination is based on the facts of the case.

Id. at 460; *accord In re Murray*, 191 B.R. 309, 315 (Bankr.E.D.Pa.1996), aff'd, 191 B.R. 309 (E.D.Pa.1996).

A review of the UCS leases reveals that they fall neatly within the exception to case-by-case analysis. The leases are not terminable before the end of their 36 month term, and they provide the lessee with the right to purchase the top lifters for the obviously nominal sum of $1 apiece. Therefore, the leases are without doubt security agreements as that term is used in section 9103.

Further review of the leases reveals that they fall within subsection 9103(a)(3) concerning the sale of goods intended to be kept in a foreign jurisdiction. First, the top lifters qualify as "goods" within the meaning of the U.C.C. which generally defines the term as referring to all things that are movable. 13 Pa.C.S. § 9105. The transaction also created a purchase money security interest as required under 9103(a)(3) being that the interest was retained by the seller of the top lifters. *Id.* § 9107. Finally, the parties understood at the time the leases were negotiated, and presumably at all subsequent times, that the goods were to be kept in Pennsylvania. This understanding is evident from the leases themselves which call for delivery of the top lifters to the Debtor's facility in Philadelphia. Thus, section 9103 applies and it states that the law of the intended receiving jurisdiction, Pennsylvania in this case, controls perfection and the effect of perfection or nonperfection.

Turning to Pennsylvania law, it is evident that UCS's security interest in the top lifters was required to be perfected by the filing of a financing statement. *See Id.* § 9302 (generally requiring the filing of a financing statement except in specified instances). UCS's failure to file a financing statement in accordance with the U.C.C. renders its interest unperfected. *In re Woolaghan*, 140 B.R. 377, 386 (Bankr.W.D.Pa.1992). Accordingly, UCS's interest is subordinate to any party who becomes a lien creditor, 13 Pa.C.S. § 9301(a)(2), which is defined to include a trustee in bankruptcy. *Id.* § 9310(c). Pursuant to section 544 of the Bankruptcy Code, 11 U.S.C. § 544, a bankruptcy trustee has the status of a judicial lien creditor with the power to avoid any transfer or interest in property inferior thereto. Accordingly, in bankruptcy, as the holder of an unperfected security interest, UCS must assume the position of an unsecured creditor.

UCS, then, is neither the holder of an executory contract nor a security interest. It has no right to any type of performance under section 365 that might be due and owing with respect to an unassumed executory contract, no right to have the contract rejected by operation or law or otherwise, and no right to demand or collect any form of adequate protection payments. UCS has no continuing interest in the top lifters and they are property of the estate in their entirety.

## CONCLUSION

UCS's motions seeking to have the leases for the top lifters assumed or rejected and seeking compensation for the use of the top lifters are denied. Any money placed in escrow for potential payment to UCS on account of the top lifters pending the resolution of this matter is released to its rightful owner.